# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

PRODUCTIVE MD, LLC,          )
                               )
     **Plaintiff,**             )
                               )     **Case No. 3:12-cv-00052**
**v.**                           )
                               )     **Judge Aleta A. Trauger**
**AETNA HEALTH, INC., and**     )
**AETNA LIFE INSURANCE COMPANY, INC.,** )
                               )
     **Defendants.**         )

## MEMORANDUM

Pending before the court are several motions filed by defendants Aetna Health, Inc. and Aetna Life Insurance Company, Inc. (collectively, "Aetna") and by the plaintiff, Productive MD, LLC ("Productive MD").

Aetna has filed a Partial Motion to Dismiss Second Amended Complaint (Docket No. 108) ("Motion to Dismiss ERISA-Governed Claims") and a Partial Motion to Dismiss the Non-ERISA Claims (Docket No. 116) ("Motion to Dismiss Non-ERISA Claims"), with respect to which Productive MD filed Responses in opposition (Docket Nos. 140 (non-ERISA) and 141 (ERISA)), Aetna filed a consolidated Reply (Docket No. 146), and Productive MD filed a Sur-Reply (Docket No. 152). Aetna has also filed a Motion to Sever the Non-ERISA Claims (Docket No. 86), to which Productive MD filed a Response in opposition (Docket No. 90), and Productive MD filed a Reply (Docket No. 93).[1]

Productive MD has filed a Motion for Order Specifying Contents of Administrative Record (Docket No. 95), with respect to which Aetna has filed an unopposed Motion for Leave to

---

[1]The parties agreed that the court should address the Rule 12(b)(6) motions before the Motion to Sever. (*See* Docket No. 115, 2/20/14 Order by Magistrate Judge ¶ 5.)

file an additional legal brief (Docket No. 125).   Productive MD has also filed a Motion for

Protective Order (Docket No. 134), with respect to which it has filed an unopposed Motion to

Supplement (Docket No. 144).

For the reasons stated herein, the Motion to Dismiss ERISA-Governed Claims will be

granted in part and denied in part, the Motion to Dismiss Non-ERISA Claims will be granted in

part and denied in part, the Motion to Sever will be granted in part and conditionally denied in part,

the Motion for Order Specifying Content of the Administrative Record will be denied without

prejudice, and the Motion for Protective Order will be granted.

## BACKGROUND[2]

### I.    Professional and Technical Component Payment

Productive MD provides medical services by administering diagnostic tests at the request

of treating physicians.   The tests include EKG testing, cardiopulmonary exercise tests, pulmonary

function tests, and resting metabolic tests.   The tests can identify heart disease and lung disease,

among other conditions.   The tests can also help rule out certain medical conditions in an effort to

avoid more expensive and invasive testing.   Productive MD only tests a patient after a treating

physician determines that the test is medically necessary.

In connection with each test at issue in this case, Productive MD had the patient sign a

consent form ("Patient Consent Form"), which, in most relevant part, contained the following

language:

_____

[2]Unless otherwise noted, the facts are drawn from the allegations in the Second Amended
Complaint ("SAC") (Docket No. 98) and the attachments thereto.   For purposes of the pending
Rule 12(b)(6) motions, the court assumes that all of the well-pleaded factual allegations are true
and construes those allegations in the light most favorable to Productive MD.   *See Directv, Inc. v.
Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir.
2002).

> I authorize payment of medical benefits to Productive MD for services rendered. I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to Productive MD.

(*See* SAC Attachment G.) Productive MD argues that this paragraph, particularly the first sentence, constituted a valid assignment of each patient's right to recover health insurance benefits under the patient's insurance plan.

Once each test was performed, the treating physician and Productive MD, purporting to "stand in the shoes" of the insured patient under the patient assignments, filed separate claims for payment to the patient's insurer. Productive MD requested payment for the "technical" component of each test, which included providing equipment and a technician to administer the test. With respect to that same test, the prescribing physician separately and simultaneously requested payment for the "professional" component, which included interpreting and utilizing the test results for the patient's benefit.

Aetna administered (and in some cases also insured) health insurance plans for some of the patients on whom Productive MD performed a diagnostic test at a physician's request. This case concerns claims for payment by Productive MD to Aetna related to 167 of these patients.

## II.     Aetna's Non-Payment of Technical Component Claims by Productive MD

Certain medical providers contract with Aetna to join Aetna's "network" of medical providers. In return for joining Aetna's network, these "in-network" providers agree to lower reimbursement rates (for insurance claims administered by Aetna) than they might otherwise charge. Relative to Aetna, the physicians who ordered the tests at issue here were "in-network" providers, whereas Productive MD was not.

Before 2005, Aetna regularly paid Productive MD's "technical component" claims for

each test performed.   However, from that year forward, Aetna began regularly denying most claims by Productive MD.   By 2008, Aetna was paying less than 2% of Productive MD's technical component claims.   After Productive MD made an unspecified legal challenge to Aetna's handling of those denied claims, the parties in July 2009 reached a negotiated settlement of the outstanding claims for payment relating to claims for dates of service through May 31, 2009.

Following that 2009 settlement, Aetna has denied virtually all technical component claims filed by Productive MD.[3]   At the same time, Aetna has generally allowed – in whole or in part – the professional component claims filed by the physicians *with respect to the same tests*. Productive MD alleges that there is a simple explanation for this incongruence: Aetna is attempting to punish Productive MD for refusing to join Aetna's provider network at the lower reimbursement rates that Aetna seeks.

Productive MD's Second Amended Complaint attaches data compilations that reflect obvious discrepancies between Aetna's handling of the professional component claims on the one hand and the technical component claims on the other.   (*Compare* SAC Attachments A-1 and A-2 (listing, by patient, claims by Productive MD that Aetna has not paid), with SAC Attachment D (listing, by patient and CPT code, Aetna's handling of claims for payment billed by physicians).)[4]

---

[3]Attachment A-1 to the SAC lists claims for payment by Productive MD at issue in this case, including the date on which Productive MD performed each test.   The earliest test at issue was performed on June 1, 2009.   (*See* SAC, Attachment A-1, Patient No. 56.)   Therefore, it appears that the post-settlement claims at issue in this case run from June 1, 2009 forward.

[4]As the court understands the process, the physicians and Productive MD bill an insurer under preset "CPT" codes that may correspond to multiple aspects of the same test.   The manner in which particular physicians and Productive MD seek payment under these codes is not identical from patient to patient.   For example, one physician might seek payment under eight different CPT codes related to testing on patient X (purporting to reflect eight different components of the physician's work with respect to that patient), whereas another physician might seek payment under 11 different CPT codes with respect to patient Y for essentially the same type of patient care.

For example, as to diagnostic testing performed by Productive MD on "Patient 3",[5] Aetna allowed

payment under eight of the nine professional component CPT codes submitted by the physician

(Attachment D at p. 1)), but completely denied Productive MD's request for payment for

performing that test (*see* SAC Attachment A-1 at p.1).   This is just one example among many: of

the 167 tests at issue, Aetna completely denied Productive MD's claims for payment as to 162 of

those tests.   With respect to the remaining tests (Patients 22, 89, 129, 163, and 173), Aetna paid

only a small fraction of Productive MD's bills ($1,172.96 paid out of $8,482.00 billed).

Cumulatively, by the court's calculation, Aetna has not paid $382,146.14 out of $390,628.14 in

disputed charges billed by Productive MD.   In other words, during the relevant three-year time

period, Aetna denied 98% of Productive MD's charges (collectively), including all of the charges

for 97% of the tests performed by Productive MD.[6]

---

Furthermore, with respect to the CPT codes billed relative to a particular patient, Aetna may allow
claims under some of the CPT codes and may deny claims under other codes, which cumulatively
results in a partial payment.   (*See, e.g.* SAC Attachment D, Patient No. 17 (reflecting both (a)
payment by Aetna as to 7 of the 11 CPT codes billed by the treating physician, and (b) denial of
payment with respect to the remaining 4 CPT codes billed by the physician).)   Productive MD
similarly billed its technical component services under multiple CPT codes relative to each patient.
(*See* SAC Attachment C.)

[5]Productive MD has classified each test by patient number, which seems to provide a
logical way of organizing and cross-referencing the relevant information at issue (technical
component claims by CPT code, professional component claims by CPT code, insurance plans,
status of appeal, etc.)   Aetna has resisted adopting this approach.   Going forward, if the parties
cannot agree on a sensible rubric for organizing this information in their submissions, the court
expects that the Magistrate Judge will impose one.

[6]In support of its Reply concerning the Motion to Dismiss ERISA-Governed Claims, Aetna
has filed records showing that it paid Productive MD $799.77 with respect to five claims for
payment.   (*See* Docket No. 146, Ex. C.)   Those payments presumably should correspond to the
five claims identified in SAC Attachments A-1 and A-2 reflecting partial payment to Productive
MD, although the numbers do not completely match up.   For purposes of this opinion, these
minor discrepancies are immaterial.   The court expects that the parties will ultimately stipulate to
the exact amount that Aetna allowed and that Productive MD was paid relative to these patients.

Productive MD contends that Aetna could not logically pay the professional component claims while simultaneously denying the technical component claims. According to Productive MD, when Aetna paid the professional component billed by an in-network physician, that payment necessarily reflected Aetna's determinations that (a) the test was medically necessary for purposes of the underlying insurance plan, (b) the test was otherwise reimbursable under the underlying insurance plan, and (c) the information presented by the physician was sufficient to establish that the test was medically necessary and reimbursable. Thus, when Aetna paid the physician with respect to a particular test, Aetna also should have paid Productive MD's technical component based on the same information. Productive MD argues that Aetna's consistent failure to do so demonstrates its inherent bias against Productive MD as an out-of-network provider.

Productive MD also alleges that Aetna "flagged" claims for payment by Productive MD and directed them to a "Special Investigations Unit" ("SIU") for special handling. The individual claims administrators within the SIU received some type of automated notification within Aetna's claims administration system, indicating that the tests had been flagged for "overutilization" (or words to similar effect). According to Productive MD, the claims administrators often followed those suggestions and accordingly denied payment for the technical component of the test as medically unnecessary. Aetna allegedly adopted special protocols for handling Productive MD's claims pursuant to an internal policy memorandum concerning Productive MD's tests.

Productive MD also alleges other facts tending to show bias by Aetna. For example, Productive MD alleges that Jayna Harley, an Aetna "network executive," told Productive MD's President that Productive MD's claims were being denied specifically because Productive MD was an out-of-network provider. Productive MD alleges that patients have reported to Productive MD that Aetna has told them that Productive MD is not being paid because it is an out-of-network

provider.

### III.     <u>Aetna's Alleged Conduct in the Claims Administration Process</u>

Productive MD alleges that, in the context of discriminating against Productive MD, Aetna utilized the claims administration process to punish Productive MD for refusing to join Aetna's network.   Aetna allegedly dragged its feet in processing claims, imposed procedural hurdles on Productive MD that it did not impose on the in-network physicians who ordered the same underlying tests, and made meritless excuses for denying payment to Productive MD.

For example, in some instances, Aetna allegedly paid an in-network physician the professional component as medically justified (and covered by) the underlying patient's plan, while simultaneously *disallowing* Productive MD's technical component claim as not medically justified.   In other instances, Aetna allowed the in-network physician's claim without requesting the physician's records, but simultaneously denied Productive MD's technical component on the grounds that Aetna *did not have the physician's records*.   With respect to many of Productive MD's claims for payment at issue, Aetna allegedly has also refused to respond (either entirely or in a timely fashion) to claims submitted by Productive MD in the first instance or on appeal, as set forth in Attachment J to the SAC.   (*See, e.g.*, SAC Attachment J, Patient 11 (last response from Aetna on October 21, 2011: "These expenses require further review."); Patient 22 (second appeal sent May 20, 2010, no further action by Aetna); and Patient 46 (first appeal sent June 27, 2010, no further action by Aetna).)

As to the status of Productive MD's claims for payment, Aetna concedes that Productive MD exhausted its administrative remedies as to 41 of the claims.   However, Aetna contends that Productive MD's other claims for payment are not ripe for adjudication because Productive MD has not exhausted its administrative remedies.   Productive MD alleges that Aetna denied the 41

"exhausted" claims and did not reverse its determination during the administrative appeals process.   Productive MD alleges that completing the appeals process with respect to the remaining claims would be an exercise in futility.

In the claims administration process, Aetna never challenged the validity of Productive MD's assignments from the underlying patients, even where the underlying plan (to which Productive MD was not privy) purported to restrict assignment.[7]   Moreover, for each particular patient, both the physician and Productive MD necessarily billed Aetna for payment pursuant to a patient assignment.   Thus, with respect to all the tests at issue here, Aetna allegedly paid the physicians without challenging assignment, regardless of the underlying insurance policy terms.

## III.   <u>Three Rivers Provider Network</u>

Productive MD alleges that Aetna breached the terms of a contract between Productive MD and Aetna arising from both parties' participation in the "Three Rivers Provider Network," which is administered by Three Rivers Providers Network, Inc. ("TRPN").   As the court understands Productive MD's allegations, TRPN contracts with medical services providers (such as Productive MD) to join TRPN's preferred provider network.   TRPN also contracts with insurance companies, third party administrators, and health plans ("payors") for the right to access TRPN's provider network.

---

[7]Although the court need not reach the issue for the reasons stated herein, the underlying plans apparently contain different approaches to assignment: some permit it, some purport to restrict it completely, and others purport to restrict it subject to certain conditions.   With respect to the 60 claims for payment subject to plans that purport to restrict assignment, the parties dispute the validity and clarity of those provisions.   In the interest of judicial economy, the court refrained from having the parties analyze and further brief the plan-by-plan anti-assignment clause dispute. As explained herein, Productive MD has plausibly established that Aetna is estopped from contesting assignment with respect to those 60 claims for payment and/or has waived the right to contest assignment, regardless of the terms of the underlying policies.

Productive MD has attached to the SAC its contract with the TRPN.  (*See* SAC

Attachment H.)   Under the terms of that contract, the payors are obligated to pay "contracted

providers" (such as Productive MD) 80% of the contracted provider's usual charges for covered

services, which are defined as "all services that are medically necessary[.]"   The payors "are

obligated to make payment directly to provider[s] only at the contracted rate as payment in full."

The agreement obligates Productive MD not to balance bill patients upon receipt of payment in full

"at the contracted rate."   Productive MD alleges that Aetna is one of the payors with whom TRPN

contracted during the relevant time frame.   Productive MD alleges that Aetna has its own contract

with TRPN, which Aetna has refused to furnish to Productive MD.

With respect to 100 of the 167 tests at issue in this case, Aetna's Explanation of Benefits

("EOB") forms to Productive MD contained the notation "TRPN HOSP/ANCILLARY NAP."

Productive MD alleges that this notation reflected Aetna's agreement to the TRPN provider

network terms, under which Productive MD was entitled to 80% of its usual charges for medically

necessary tests.   Productive MD alleges that, by failing to pay Productive MD for "medically

necessary" services, Aetna breached its obligations as a payor in the TRPN arrangement.

## IV.   __Productive MD's Causes of Action__

In its Second Amended Complaint, Productive MD asserts the following claims:

1. Breach of the TRPN Agreement with respect to approximately 100 claims for payment;

2. Claims arising under ERISA with respect to 160 claims for payment relating to insurance policies governed by ERISA, including (a) a claim for recovery of medical benefits due under 29 U.S.C. § 1132(a)(1)(B), and (b) a claim for failure to provide a full and fair review under 29 U.S.C. § 1133 and 29 C.F.R. § 2560-503-1;[8]

_____

[8]Productive MD also asserts that Aetna breached its fiduciary duties under 29 U.S.C. § 1132(a)(3) and failed to provide plan documents under 29 U.S.C. § 1132(c).   (*See* SAC ¶ 220.) However, Productive MD concedes that, "absent further assignment or declaration of the Court,"

3.      Breach of contract with respect to the underlying insurance plans;

4.      Violation of the Tennessee Prompt Pay Act, Tenn. Code Ann. § 56-7-109;

5.      Bad faith failure to pay first-party claims in violation of Tenn. Code Ann. § 56-7-105;

6.      Unjust enrichment;

7.      A right of recovery *in quantum meruit*; and

8.      Interference with contract and prospective business relations.

Productive MD demands a jury trial as to all non-ERISA claims.   With respect to the ERISA claims, Productive MD demands actual damages, prejudgment interest, attorney's fees, and post-judgment interest.   Productive MD also requests treble damages with respect to the tortious interference claims, injunctive relief prohibiting interference with Productive MD's contracts and prospective business relations, an order enjoining Aetna from continuing to engage in "wrongful rejection" of Productive MD's claims, a stay of any pending claims for payment by Productive MD that have not been administratively exhausted, and an evidentiary hearing concerning Aetna's alleged bias and conflict of interest.

V.      **Overview of Claims for Payment at Issue**

Of the 167 claims at issue, 160 relate to insurance plans governed by ERISA ("ERISA-governed claims for payment"), one relates to an insurance plan governed by Medicare ("Medicare-governed claim for payment"), and six others relate to plans that are governed by Tennessee law ("Tennessee-governed claims for payment").[9]

---

these two claims were retained by the respective patients.   (*Id.*)

[9]ERISA does not apply to self-funded church or government plans.   29 U.S.C. § 1003(b). (*See, e.g.*, SAC Attachment A, Patient No. 97 (listing First Baptist Church as plan sponsor).)   In

Aetna argues that, with respect to all 167 claims, Productive MD never received a purported assignment in the first place, thereby depriving Productive MD of standing to sue. Aetna also contends that, even if Productive MD's assignments were otherwise valid, (1) 60 of the 160 ERISA-governed claims for payment and three of the non-ERISA claims for payment (including two Tennessee-governed claims for payment and the Medicare-governed claim for payment) should be dismissed because the underlying Plans did not permit assignment in the first place, and (2) all but 45 of the claims for payment are not ripe for adjudication because Productive MD has not exhausted its administrative remedies.[10]

In the interest of judicial economy, the court ordered the parties to brief several threshold legal issues, none of which would require the court to conduct a plan-by-plan analysis of the

---

its Motion to Dismiss the original Complaint (Docket No. 12), Aetna had argued, *inter alia*, that (1) ERISA preempted all of Productive MD's legal claims, and (2) Productive MD had failed to exhaust its administrative remedies with respect to all of the claims for payment at issue. Limited court-ordered discovery of information known to Aetna at the time it filed the Motion to Dismiss (*see* Docket No. No. 16, March 9, 2012 Order) has established what the court originally suspected: contrary to Aetna's representations in support of its original Motion to Dismiss, (1) some of the claims for payment did *not* relate to ERISA-governed plans in the first place, and, therefore were not preempted by ERISA; and (2) Productive MD *did* exhaust its administrative remedies with respect to numerous claims for payment at issue.

[10]Aetna has represented that, as to the ERISA-governed claims for payment, (1) 32 of the claims for payment have been administratively exhausted and are "ripe" for review; (2) 68 of the claims were not administratively exhausted, although the underlying Plans did permit assignment; (3) 43 of the claims were not administratively exhausted and the underlying plans did not permit assignment; and (4) the remaining 17 claims for payment were administratively exhausted, but the underlying Plans did not permit assignment. Productive MD seems to take issue with these figures, at least at the margins. For purposes of this opinion, any minor discrepancies would be immaterial, so the court will assume that Aetna's figures are correct. Aetna also contends that, of the non-ERISA claims for payment, Productive MD did not exhaust its administrative remedies as to two of the Tennessee-governed claims for payment and the Medicare-governed claim for payment, and that the underlying policies did not permit assignment as to three of the Tennessee-governed claims for payment. The court will also assume that those figures are correct.

numerous underlying insurance plans.   As explained herein, the court finds that, at least at this stage, it is not necessary to address the additional plan-specific issues raised by Aetna.

<u>**ANALYSIS**</u>

**I.      <u>Productive MD's Standing to Sue</u>**

Aetna argues that Productive MD lacks standing to sue.   The issue of Productive MD's standing implicates at least three separate inquiries: (1) with respect to all of the claims for payment at issue, could the purported assignment language in the Patient Consent Forms constitute an assignment to Productive MD of the patient's right to recover benefits under the applicable insurance policy? (2) regardless of whether the underlying insurance policies purported to prohibit assignment, is Aetna estopped from challenging standing with respect to the claims for payment at issue? and (3) regardless of whether Productive MD has standing to recover benefits under the applicable insurance policy as an assignee of the plan participant or beneficiary, does Productive MD independently have standing to sue for breach of contract under the TRPN agreement?

**A.      Assignment Language**

Aetna argues that the alleged "assignment" language in the Patient Consent Forms did not contain language sufficient to convey an assignment, regardless of the terms of the underlying insurance plan.   Resolving this question actually involves three separate inquiries: was the assignment sufficient to confer standing with respect to (1) the ERISA-governed claims for payment, (2) the Medicare-governed claim for payment, and/or (3) the Tennessee-governed claims for payment?

**1.      <u>Assignments Under ERISA</u>**

Section 502 of ERISA, 29 U.S.C. § 1332(a), provides that a civil action may be brought under ERISA by a plan "participant," "beneficiary," or "fiduciary," or by the Secretary of Labor.

12

The Sixth Circuit has found that a health care provider "may assert an ERISA claim as a 'beneficiary' of an employee benefit plan if it has a received a valid assignment of benefits." *Cromwell v. Equicor Equitable HCA Corp.*, 944 F.2d 1272, 1277 (6th Cir. 1991) (citing *Hermann Hosp. v. MEBA Med. & Benefits Plan*, 845 F.2d 1286 (5th Cir. 1988)).[11]  Here, the "Patient Consent Form" purports to convey to Productive MD the patient's right to payment of "medical benefits."   The question is whether, subject to the terms of each underlying insurance policy, that language would otherwise be sufficient to support Productive MD's standing to sue.

There is no binding Sixth Circuit authority on this issue.   The cases cited by Aetna and Productive MD demonstrate that federal courts have reached inconsistent conclusions about whether assigning the right to payment confers standing.   Aetna has identified several unpublished district court cases holding that conveying a right to payment is not sufficient to support standing under ERISA.   *See, e.g.*, *Touro Infirmary v. Am. Maritime Officer*, Civil Action No. 07-1441, 2007 WL 4181506, *5-*6 (E.D. La. Nov. 21, 2007) (where release stated, "I assign and hereby authorize . . . direct payment to the Hospital . . . of all insurance and health plan benefits otherwise payable to or on behalf of me for this hospitalization or for these outpatient services," assignment "simply authorizes direct payment to [the provider] and, as an incomplete assignment of benefits, was insufficient to support standing under ERISA").[12]   On the other hand, other

<hr>

[11]The Sixth Circuit's position in *Cromwell* is consistent with the position of several other circuits on this issue.   *See Cagle v. Bruner*, 112 F.3d 1510, 1515 (11th Cir. 1997); *Lutheran Med. Ctr. v. Contractors Health Plan*, 25 F.3d 616, 619 (8th Cir. 1994); *Misic v. Bldg. Serv. Employees Health & Welfare Trust*, 789 F.2d 1374, 1379 (9th Cir. 1986); *Plumb v. Fluid Pump Serv., Inc.*, 124 F.3d 849, 863 (7th Cir. 1997); *see also Barix Clinic of Ohio, Inc. v. Longaberger Family of Cos. Med. Plan*, 459 F. Supp. 2d 617, 624 (S.D. Ohio 2005) (applying *Cromwell*); *Univ. of Tenn. William F. Bowld Hosp., v. Wal-Mart Stores, Inc.*, 951 F. Supp. 724, 728 (W.D. Tenn. 1996) (same).

[12]*See also MHA, LLC v. Aetna Health, Inc.*, No. 12-2984, 2013 WL 705612, at *3 (D.N.J.

courts, including the Eleventh Circuit, have concluded that conveying a right to payment *is* sufficient to confer standing for purposes of ERISA.   *See, e.g., Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1352 (11th Cir. 2009) (concluding that "assignment of the right to payment is enough to create standing," because "[a]n assignment to receive payment of benefits necessarily incorporates the right to seek payment.   [T]he right to receive benefits would be hollow without such enforcement capabilities"); *N. Jersey Brain & Spine Ctr. v. Conn. Gen. Life Ins. Co.*, No. 10-4260, 2011 WL 4737067, at *5 (D.N.J. June 30, 2011) (following language sufficient to confer standing: "I hereby assign to North Jersey Brain & Spine Center all payments for medical services rendered to myself or my dependents"; court reasoned that "an assignment of a right to reimbursement logically includes the right to judicially enforce the reimbursement rights, and thus, creates a valid assignment under ERISA").[13]

In ascertaining on which side the Sixth Circuit would fall on this divide, *Cromwell* suggests that the right to payment *is* sufficient to support standing.   In *Cromwell*, the plaintiff health care provider filed suit in state court, alleging standing based on an assignment of benefits from the insureds.   944 F.2d at 1275.   After the defendant insurer removed the case, the district court

Feb. 25, 2013) (following language insufficient to confer standing: "I authorize payment directly to [provider] for hospital medical insurance benefits . . . that I may be entitled to for the charges of the care/treatment provided to me").   The *MHA* case, on which *Aetna* relies heavily here, itself acknowledged that its holding conflicted with that of other federal cases, including other decisions within the District of New Jersey.

[13]*See also Wayne Surgical Ctr., LLC v. Concentra Preferred Sys., Inc.*, Civil Action No. 06-928, 2007 WL 2416428, at *4 (D.N.J. Aug. 20, 2007) ("[I]t is illogical to recognize that [the provider] as assignee has a right to receive the benefit of direct reimbursement from its patients' insurers but cannot enforce this right."); *Dallas Cnty. Hosp. Dist. v. Blue Cross Blue Shield of Tex.*, No. 3:05-CV-0582-BF(M), 2006 WL 680473, at *4 (N.D. Tex. Mar. 14, 2006) (where consent form stated that patient "authorizes payment directly to [provider] of all benefits otherwise payable to me or for me by any third party payor," court "can only conclude that [the patient] intended to assign all her benefits, including benefits under the Plan, to [the provider]").

denied the provider's motion to remand, finding that the court retained jurisdiction over the case because the insurance plan at issue was governed by ERISA. *Id.* at 1275. Later in the case, the district court granted summary judgment to the defendant insurer, finding that the patient actually did not have insurance benefits to convey in the first place because he had already terminated his employment by the time he received care.[14] On appeal, the provider argued that it was inconsistent for the district court to (1) find that jurisdiction was appropriate under ERISA at the outset of the case and (2) at a later stage in the case, reach the issue of standing and find that the provider lacked standing to sue in the first place.

In determining whether the district court appropriately found that it had jurisdiction in denying the motion to remand, the Sixth Circuit analyzed whether the original complaint allegations, taken as true, established that the providers were suing the insurer pursuant to a valid patient assignment. *See id.* at 1277-78. The relevant provision, entitled "Assignment of Insurance Benefits," authorized "[p]ayment directly to . . . [appellants] of any and all sums of money otherwise payable to me under the terms of the home health provisions of said group policy or contract." *Id.* at 1275. The Sixth Circuit found that the complaint allegations had sufficiently established standing at the time of removal:

> Appellants' complaint also indicated that they had standing to bring the ERISA claim. A health care provider may assert an ERISA claim as a "beneficiary" of an employee benefit plan if it has received a valid assignment of benefits. *Hermann v. Hospital v. Hermann MEBA Med. & Benefits Plan*, 845 F.2d 1286 (5th Cir. 1988). Appellants alleged that they received a valid assignment of benefits. If the assignment of benefits did actually convey rights under the plan, appellants clearly would have had standing to sue under ERISA. *There was nothing in*

---

[14]According to the majority opinion in *Cromwell*, "the Reinkes had no right to any further benefits under the plan at the time they executed the assignment of benefits clause[.]" 944 F.2d at 1275 n.1. On appeal, the provider did not dispute that the assignment was in fact invalid on that basis.

*appellants' complaint indicating that the assignment of benefits was invalid or ineffective*. To the contrary, appellants repeatedly relied on the assignment of benefits and their rights "standing in the shoes" of the Reinkes vis-a-vis the health insurance contract.

. . . [N]*othing in appellants' allegations at the time of the petition for removal could have alerted the district court that standing would even be at issue in the case*. Appellants clearly claimed to be entitled to benefits due them from the [underlying insurance] plan as beneficiaries by virtue of the assignment of benefits clause. Thus, appellants have alleged standing sufficient to support removal.

944 F.2d at 1277-78 (emphases added). In sum, the Sixth Circuit found that, for purposes of standing, the assignment of benefits language authorizing "*payment* directly to" the medical providers was sufficient to confer standing.[15]

Here, particularly in light of *Cromwell*, the court is persuaded that the language at issue was sufficient to constitute an assignment to Productive MD of the patient's right to recover payments under the patient's insurance plan. Aetna has not explained what "the payment of medical *benefits* . . . for services rendered" could mean, other than putting Productive MD in charge of collecting medical insurance benefits from the applicable insurer. Indeed, this language is generally consistent with the language in *Cromwell*, which authorized "payment" of money to which the patient otherwise would have been entitled under a "group policy or contract."[16] The

_____

[15]In its opening brief in support of the Motion to Dismiss ERISA Claims, Aetna misconstrued *Cromwell* as holding that the assignment language at issue was presumptively invalid as a matter of law. (Docket No. 109 at p. 11.) After Productive MD pointed out that *Cromwell* actually supported Productive MD's position, Aetna changed positions in its Reply, seeking to minimize the relevant findings in *Cromwell* as *dicta* and/or as distinguishable from this case. (Docket No. 146 at pp. 8-10.)

[16]In the SAC, Productive MD reserved the right to sue the patients, if necessary. The court rejects Aetna's argument that Productive MD's reservation of rights amounts to a concession that Productive MD did not have a valid assignment. The court construes Productive MD as simply covering itself in case the court were to agree with Aetna – over Production MD's strenuous arguments to the contrary – that all of the assignments were necessarily ineffective *ab initio*.

court is not persuaded that the title of the assignment clause in *Cromwell*, which was on a form

entitled "Assignment of Insurance Benefits," provides a meaningful distinction here.   In the

context of determining standing by assignment under ERISA, the relevant language can constitute

an assignment even without the word "assignment."   *See, e.g.*, *Dallas Cnty.*, 2006 WL 680473, at

*4 (finding valid assignment, where form did not contain word "assignment"); *see also* Am. Jur.

2d Assignments § 116 ("Use of the word 'assign' or 'assignment' is not essential to effect a valid

assignment, so the parties' failure to use the word 'assignment' is not fatal to the conclusion that

they intended an assignment.")

The court is also persuaded by the reasoning of the Eleventh Circuit and numerous district

court decisions holding that assigning the right to payment to a medical provider is sufficient to

support standing under ERISA.   *See, e.g.*, *Conn. State Dental Ass'n*, 591 F.3d at 1352; *N. Jersey*

*Brain & Spine Ctr.*, 2011 WL 4737067, at *5; *Wayne Surgical*, 2007 WL 2416428, at *4;

*Encompass Office Solutions, Inc. v. Ingenix, Inc*, 775 F. Supp. 2d 938, 948-49 (E.D. Tex. 2011)

(assignment of right to payment of benefits was sufficient to support standing, even where form

did not reference assignment of right to sue); *Spring E.R., LLC v. Aetna Life Ins. Co.*, Civil Action

No. H-09-2001, 2010 WL 598748, at *4 (S.D. Tex. Feb. 17, 2010) (even where plaintiff did not

utilize an assignment form, assignment effective based on representation to insurer that provider

possessed a signed form "authorizing the third party insurer to pay the provider directly for his

services").[17]

---

[17]In *Hermann*, 845 F.2d at 1289, a case cited favorably by the Sixth Circuit in *Cromwell*,
the Fifth Circuit observed that assigning benefits furthers Congress's goal of enhancing
employees' health and welfare benefit coverage:

Many providers seek assignments of benefits to avoid billing the beneficiary
directly and upsetting his finances and to reduce the risk of non-payment.   If their

Here, Aetna's legal position elevates form over function. Productive MD performed medical services on patients without demanding up-front payment from the patients for the services rendered. Before performing that service, Productive MD had the patients sign a form conveying to Productive MD the right to recover health insurance payments to which the patients were otherwise entitled. The alleged circumstances do not indicate that the patients signed the form with the understanding that, if Aetna did not pay Productive MD benefits to which the patient was otherwise entitled under the patient's plan, Productive MD would *sue the patient* for the balance. Indeed, Productive MD does not allege that it has ever pursued any of the 167 patients at issue for the unpaid balances at issue, which relate to claims that span nearly three years of testing. Moreover, the SAC contains no allegation that any of the 167 patients attempted to pursue claims for payment related to the underlying testing, which the court reasonably construes as reflecting each patient's understanding that he or she had assigned the right to recover insurance benefits to Productive MD. Also, it is not lost on the court that, in all 167 instances, Aetna treated Productive MD's patient assignment as valid. Thus, for the entire time period at issue, it appears that the 167 patients, Productive MD, and Aetna all believed that the assignment language in the Patient Consent Form constituted a valid assignment for ERISA purposes, and all treated it as such. In this arrangement, Productive MD performed medically necessary services on patients without

---

status as assignees does not entitle them to federal standing against the plan, providers would either have to rely on the beneficiary to maintain an ERISA suit, or they would have to sue the beneficiary. Either alternative, indirect and uncertain as they are, would discourage providers from becoming assignees and possibly from helping beneficiaries who were unable to pay them "up-front." The providers are better situated and financed to pursue an action for benefits owed for their services. Allowing assignees of beneficiaries to sue under § 1132(a) comports with the principle of subrogation generally applied in the law.

*Hermann*, 845 F.2d at 1289 n.13.

demanding payment up front, and Productive MD assumed both the responsibility to pursue the claims for payment – with its attendant esoteric administrative claim procedures and administrative appeals procedures – and the risk that the Aetna would pay for the services only in part or not at all.

Taken in this context, it would make little sense for the court to conclude that (1) the *patients* are the real parties in interest relative to Aetna, and (2) the patients *remain liable to Productive MD* in the first instance for the unpaid services.   Indeed, it would seem manifestly unjust to drag into this litigation all 167 patients, who would then need to sue Aetna for the unpaid balances so as to avoid paying Productive MD out of their own pockets.

In sum, the court finds that Aetna's legal position concerning assignment – which strikes the court as an *ad hoc* position developed only for purposes of this litigation – is without merit.

### 2.     The Assignment Under Medicare

Individuals insured by Medicaid routinely assign their right to collect benefits to health care providers.   *See, e.g.*, *Vencor, Inc. v. Std. Life & Accident Ins. Co.*, 317 F.3d 629, 631-32 (6th Cir. 2003).   Here, Aetna appears to assume that Tennessee law governs the issue of assignment (*see* Docket No. 146, at p. 4, Section B.1 (arguing that the seven non-ERISA claims for payment were "not assignments under Tennessee law")), an approach that Productive MD has not disputed. Therefore, for purposes of this opinion, the court will consider the validity of the Medicare assignment under the Tennessee law standard.

### 3.     The Assignments Governed by Tennessee Law

In Tennessee, "[t]he word assignment refers to the act by which an assignor transfers a contract right to an assignee."   *Collier v. Greenbrier Developers*, LLC, 358 S.W.3d 195, 201-202 (Tenn. Ct. App. 2009) (quoting Farnsworth, *Contracts* § 11.3, p. 709 (3d ed. 1999)).   To make an

effective assignment of a contract right, the owner of that right must manifest an intention to make a present transfer of the right without further action by the owner or by the obligor. *Id.* Whether the owner of a right has manifested such an intention depends on both the words used and the parties' conduct. *Id*. As with other contracts, language used in an assignment "must be taken and understood in its plain, ordinary, and popular sense." *One Commerce Sq., LLC v. AUSA Life Ins. Co., Inc.*, No. W2003-02956-COA-R3-CV, 2004 WL 2086324, at *3 (Tenn. Ct. App. Sept. 8, 2004) (citing *Bob Pearsall Motors, Inc. v. Regal Chrysler Plymouth, Inc.*, 521 S.W.3d 578 (Tenn. 1975)). Thus, the words expressing the parties' intentions should be given their usual, natural, and ordinary meaning. *Id.* (citing *Ballard v. N. Am. Life & Casualty Co.*, 667 S.W.2d 79 (Tenn. Ct. App. 1983)).

Aetna argues that, aside from the alleged assignment language, Productive MD has not pled any other facts or circumstances suggesting that the relevant patients were given additional information or explanation about any potential transfer of their legal rights to Productive MD. Aetna also argues that the following sentence in the Patient Consent Form renders the assignment invalid under Tennessee law: "I also request payment of government benefits either to myself or to Productive MD." Neither party has cited to any Tennessee authority concerning an assignment of benefits as between a patient and a health care provider, nor has the court identified any such case through its own research. Thus, this appears to be an issue of first impression under Tennessee law.

Under the factual circumstances alleged, the court construes the assignment as valid both with respect to the Tennessee-governed claims and with respect to the Medicare-governed claim. As discussed in the previous section concerning the ERISA-governed claims, in the context of a patient-provider relationship, patients routinely convey the right to payment to their medical

provider with the understanding that the provider will pursue the claim for benefits under the applicable insurance policy.   There is no indication in the SAC that Productive MD pursued its patients for reimbursement after receiving claim denials by Aetna, or that the patients signed the Patient Consent Forms with any expectation that Productive MD could sue them if Productive MD did not receive full reimbursement from Aetna.   With respect to the government benefits clause, the court construes it as a contingent assignment that turned on whether the patient or Productive MD pursued the claim for payment for services rendered by Productive MD.   In this case, Productive MD pursued the claim for benefits under Medicare, thereby electing to act as assignee and, therefore, also assuming the risk of non-payment by Aetna for services that Productive MD performed without demanding payment in advance.   Accordingly, the court finds that the assignments were valid with respect to the Tennessee-governed claims for payment and the Medicare-governed claim for payment.

**B.     Waiver and Estoppel**

Productive MD argues that Aetna has either waived or is estopped from contesting Productive MD's right to sue under the assignments.   Thus, Productive MD argues that, regardless of the assignment language and/or whether the underlying plan permitted assignment, Aetna cannot now challenge the assignments.[18]   Although Productive MD at times elides the two concepts, waiver and estoppel are distinct concepts that the court will consider separately.   The court must also distinguish among the ERISA-governed, Medicare-governed, and

---

[18]Aetna argues that, even assuming *arguendo* that the assignment language was not defective, the underlying plans governing 60 of the 160 ERISA-governed claims contained "anti-assignment" clauses.   Productive MD argues that the court need not even examine the underlying policy documents, because Aetna has either waived the right to challenge assignment or should be estopped from doing so.

Tennessee-governed claims for payment as to each doctrine.

1.    Estoppel with Respect to ERISA-Governed Claims

The application of the estoppel doctrine requires a close analysis of Sixth Circuit

precedent, particularly *Sprague v. Gen. Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) and *Riverview*

*Health Institute LLC v. Med. Mutual of Ohio*, 601 F.3d 505 (6th Cir. 2010).

a.    *Sprague*

*Sprague* involved a lawsuit between certain General Motors retirees and General Motors,

which had provided the retirees with medical benefits upon their retirement.   133 F.3d at 392-93.

The underlying retirement plans and numerous formal communications from General Motors

informed the retirees that General Motors specifically reserved the right to amend, change, or

terminate the retirement plans at any time.   *Id.* at 393-94.   Pursuant to this express reservation,

General Motors materially reduced the retirees' health insurance benefit plans in 1987.   *Id.* at 395.

The retirees sued, arguing that General Motors had orally and/or through informal

communications told the retirees that their health care benefits had vested, notwithstanding the

underlying policy terms.   *Id.* at 395.   The retirees argued*, inter alia*, that (1) General Motors'

representations amended the underlying health care insurance plans; or, in the alternative, (2)

General Motors was estopped from enforcing the written plan terms because of its misleading

informal representations about the plan terms.   *Id.* at 399-404.

The Sixth Circuit rejected both arguments.   First, the court found that "the clear terms of a

written employee benefit plan may not be modified or superseded by oral undertakings on the part

of the employer."   *Id.* at 403.   The court emphasized that ERISA requires that every plan must be

reduced to writing, thereby ensuring "that every employee may, on examining the plan documents,

determine exactly what his rights and obligations are under the plan."   *Id.* at 403. Accordingly, the

court held that alleged oral statements by General Motors did not modify or supplant the underlying unambiguous plan terms, which expressly stated that the retirees' benefits were not vested. *Id.* at 403. Similarly, the court found that written "statements of acceptance," which did not purport to be plan amendments, did not alter the underlying plan documents. *Id.* The court emphasized that, "[f]or us to sanction informal 'plans' or plan 'amendments' – whether oral or written – would leave the law of employee benefits in a state of uncertainty and would create disincentives for employers to offer benefits in the first place." *Id.*

The plaintiffs in *Sprague* also argued, in the alternative, that General Motors should be estopped from enforcing the unambiguous plan terms because it had misrepresented those terms through the informal oral and written statements. The court stated that "equitable estoppel may be a viable theory in ERISA cases, at least in regard to welfare plans," *id.*, provided that the following elements are met: (1) there must be conduct or language that amounts to a representation of material fact; (2) the party to be estopped must be aware of the true facts; (3) the party to be estopped must have the intent that the representation be acted on or the party seeking estoppel must reasonably believe that the party to be estopped so intends; (4) the party asserting the estoppel must be unaware of the true facts; and (5) the party seeking estoppel must reasonably or justifiably rely on the representation to his detriment. *Id.* at 403.

Addressing whether the retirees could have reasonably relied on informal representations that conflicted with the express terms of the plan documents to which those retirees were privy, the court reasoned as follows:

> Principles of estoppel, however, cannot be applied to vary the terms of unambiguous plan documents; estoppel can only be invoked in the context of ambiguous plan provisions. There are at least two reasons for this. First, as we have seen, estoppel requires reasonable or justifiable reliance by the party asserting the estoppel. That party's reliance can seldom, if ever, be reasonable or justifiable

if it is inconsistent with the clear and unambiguous terms of plan documents *available to or furnished to the party.* Second, to allow estoppel to override the clear terms of plan documents would be to enforce something other than the plan documents themselves. That would not be consistent with ERISA.

*Id.* at 404 (emphasis added). The court found that the estoppel claims failed as a matter of law, reasoning as follows:

As we have said, GM's plan and most of the summary plan descriptions issued to the plaintiffs over the years unambiguously reserved to GM the right to amend or terminate the plan. In the face of GM's clearly stated right to amend – a right contained in the plan *to which the plaintiffs had access* and in many of the summaries they were given – reliance on statements allegedly suggesting the contrary *was not, and could not be, reasonable or justifiable*, especially when GM never told the plaintiffs that their benefits were vested or fully paid-up.

*Id.* at 404 (emphases added).

As this court construes *Sprague*'s estoppel discussion, the court's holding turned on the fact that the retirees possessed or had a right to access the underlying plan documents. Because the terms of the plan unambiguously established that the benefits were not vested, there was no reasonable way that the retirees could have relied on oral and/or informal written communications intimating otherwise. On the other hand, if the documents had been ambiguous on this point, the court suggested that the retirees could have relied on the employer's representations as essentially clarifying the ambiguous plan terms. Taken in context, the ambiguity requirement set forth in *Sprague* applies when an entity *possesses* or *legally has access to* the underlying plan terms.

Notably, *Sprague* did not concern the relationship between plan participants/beneficiaries and their medical providers; therefore, the case necessarily did not address any issues concerning assignment or the application of the estoppel doctrine to parties not privy to the underlying plan terms – such as a medical provider acting pursuant to an assignment.

b.     *Riverview Health*

*Riverview Health* referenced the *Sprague* estoppel doctrine in a peculiar procedural posture and involved what appears to be a misinterpretation of *Sprague* by the plaintiffs in the case.

In *Riverview Health*, the plaintiff health care providers, acting pursuant to patient assignments, had requested and received payment from the defendant insurer, Medical Mutual, for several years.   601 F.3d at 510.   After identifying billing discrepancies and inaccuracies in the providers' billing requests, Medical Mutual informed the providers that it would no longer pay the claims and that it sought to recoup nearly $800,000 in past payments to the providers.   *Id.* The providers then sued Medical Mutual, alleging RICO claims, claims for denial of benefits under ERISA, and state-based fraud and tortious interference claims – none of which relied upon an assignment from the underlying patients.   *Id.* at 511.   The district court dismissed the RICO claims with prejudice and declined to exercise supplemental jurisdiction over the state law claims. *Id.* at 511-12.

After judgment, the providers sought leave to amend under Rule 15 to add an estoppel claim, arguing that they were assignees of their patients' claims and that Medical Mutual was estopped from contesting the assignments.   *Id.* at 512, 519.   In response, Medical Mutual presented evidence that each insurance policy at issue contained an anti-assignment provision that barred the providers from receiving a valid assignment.   *Id.* at 520.   The providers argued that "repeated payment" by Medical Mutual amounted to a representation that the assignments were acceptable, notwithstanding the terms of the underlying policies.   *Id.* at 520.   The providers also argued that the anti-assignment provision was invalid because Medical Mutual had "failed to provide documentation of the anti-assignment provision *to its insureds*."   *Id.* at 521 (emphasis added).   In support of this argument, the plaintiffs introduced affidavits from eight patients who claimed that Medical Mutual never told them about the anti-assignment clause.   *Id.* at 521-22.

The plaintiffs in *Riverview* appear to have rested their case on the notion that *Sprague* required health insurers to inform insureds or health care providers of assignment restrictions, and that Medical Mutual had violated that duty by failing to inform *its insureds* of the anti-assignment clause. The plaintiffs identified no legal authority (other than their misinterpretation of *Sprague*) indicating that Medical Mutual had a duty to disclose the anti-assignment clause to them at any point. As this court construes *Riverview*, the medical providers seem to have adopted the position that they stood in the shoes of the insureds as to *both* the right to recover benefits *and* the right to access the underlying plan documents. Of course, *Sprague*, which did not involve the issue of patient assignments to medical providers in the first place, did not address an insurer's duty relative to an assignee medical provider, let alone impose any obligations in that regard. Furthermore, as the parties in this case acknowledge, even after a patient conveys to a medical provider the right to recover medical insurance benefits from the insurer, the *patient* – not the medical provider – retains the right to access the plan terms from the plan administrator under ERISA. (*See* Docket No. 109, Aetna Mem., at pp. 18-19 (stating that Productive MD lacks standing to assert a claim for failure to provide plan documents).)

Unsurprisingly, the Sixth Circuit rejected the plaintiffs' arguments. The Sixth Circuit correctly observed that *Sprague* did not independently establish any duty of disclosure on the part of the insurer: "We do not think *Sprague* supports Plaintiffs' argument. *Sprague* merely says that a party's reliance can rarely, if ever, be reasonable or justifiable if such reliance is 'inconsistent with the clear and unambiguous terms of plan documents *available to or furnished to the party*.' No language in *Sprague* suggests that an insurer has an affirmative duty to make health care providers or its insured aware of this kind of language." *Riverview*, 601 F.3d at 522 (quoting *Sprague*, 133 F.3d at 404) (emphasis in original). Thus, the fact that Medical Mutual had not

26

provided information to its insureds beyond the express terms of the underlying policy, which the patients could have accessed at any time, was immaterial and insufficient to establish a reasonable reliance interest for estoppel purposes. Furthermore, the medical providers "offered no evidence that Medical Mutual failed to either *furnish its insureds* a copy of the documents containing the anti-assignment provision *or make such documents available to them* [*i.e.*, the insureds]." *Id.* at 522 (emphasis added). Ultimately, the Sixth Circuit found that, "[b]ecause the plaintiffs have failed to argue that the language of the anti-assignment provision is ambiguous and have offered no evidence that *Medical Mutual's insureds were deprived of access to the documents containing the anti-assignment clause*, Plaintiffs' argument fails." *Id.* (emphases added)

Given the obvious flaws in the plaintiffs' arguments in *Riverview*, the court does not construe *Riverview* as expanding the reasoning on which *Sprague* was premised: namely, when plan documents are legally available to or furnished to a party, that party cannot reasonably rely on representations that conflict with unambiguous plan terms. *See also Laird v. Norton Healthcare, Inc.*, 442 F. App'x 194, 202 (6th Cir. 2011) (insurance administrator not estopped from enforcing time limitation on long-term disability benefits against insured employee, where employee argued that employer's staff member informally told employee to wait to file claim). This court does not construe *Riverview* as globally precluding the application of the estoppel doctrine to medical providers acting as assignees, provided that the providers demonstrate an appropriate basis for reasonable reliance. *Riverview* merely established that (1) relying on an insurer's failure to affirmatively inform its insureds of unambiguous plan terms did not, standing alone, independently provide a basis on which the assignee, standing in the shoes of the insured, could claim a reasonable reliance interest on representations to the contrary; and (2) *Sprague* did not independently establish any duty of disclosure by the insurer.

c.      Application

Here, the alleged circumstances and legal arguments are materially different from those at issue in *Riverview*.   These differences are crucial and justify Productive MD's reliance interest for estoppel purposes.

First, unlike the plaintiffs in *Riverview*, Productive MD argues that ERISA *does* impose a legal duty on Aetna to disclose the anti-assignment clause during Aetna's claims administration process.   Under 29 C.F.R. § 2560-503-1(g)(1), a claims administrator must "provide a claimant with written or electronic notification of any adverse benefit determination."   That notification must set forth "(i) [t]he specific reason or reasons for the adverse determination; (ii) reference to *the specific plan provisions* on which the determination is based; [and] (iii) a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary . . . ."   *Id.* § 2560-503-1(g)(1)(i)-(iii) (emphasis added).   Productive MD argues that challenging the validity of assignment under the plan terms constitutes a basis for an "adverse benefit determination," which this ERISA provision obligated Aetna to disclose to Productive MD in the claims administration process.   Productive MD points out that § 503-1-(g)(1) requires an insurer to reference specific plan provisions for any adverse benefit determination, which necessarily requires the insurer to consult and apply the plan terms in the claims administration process.   Finally, Productive MD points out that the provision requires the insurer to notify the assignee how it can "perfect the claim" – *i.e.*, how to cure any alleged deficiencies in the claim.   The plaintiffs in *Riverview* did not raise this argument, which does not depend on any alleged failure by Aetna to inform its own insureds of the assignment restrictions.   Aetna's Reply brief does not address § 503-1(g)(1), let alone offer a competing interpretation of its provisions.

In addition to this new legal argument, the alleged factual circumstances here present a much more compelling case for the application of the estoppel doctrine than the circumstances at issue in *Riverview*. This case involves hundreds of instances in which Aetna, in multiple ways across at least an eight-year period, recognized the validity of Productive MD's assignments or, at a minimum, led Productive MD reasonably to believe that the assignments were valid.

Here, in 167 instances,[19] Aetna was on notice that Productive MD sought payment pursuant to a patient assignment, Productive MD was not privy to and had no legal right to access the underlying plan terms, Aetna possessed the underlying plans (and therefore knew their terms), Aetna denied Productive MD's technical component claims in whole or in part (purportedly) based on Aetna's interpretation and application of the plan terms – for reasons other than validity of assignment – and, relative to the same underlying tests based on the same insurance plans, Aetna *paid* the physicians who sought payment for the professional component pursuant to assignments from the same patients. Productive MD reasonably believed that, under ERISA's adverse benefit determination requirements, Aetna was obligated to challenge assignment in the claims administration process and, if so, to identify plan terms that foreclosed the patient assignment. Aetna's payments to the physicians in all instances – even with respect to policies that Aetna now asserts restricted or prohibited assignment – led Productive MD to believe that its assignments to recover benefits on behalf of its patients were valid both generally and with respect to the underlying insurance plans.

---

[19]The court recognizes that 7 of the claims for payment related to non-ERISA-governed policies. Nevertheless, Aetna's conduct with respect to those 7 claims is part of a continuous course of alleged conduct relative to Productive MD's claims for payment during the relevant time frame – during which time Aetna never challenged the assignments. Therefore, the court regards Aetna's conduct as to all 167 claims for payment as relevant to Productive MD's estoppel theory.

Furthermore, for a period of time through 2005, Aetna regularly *paid* Productive MD's claims made pursuant to patient assignments. In 2009, the parties settled Productive MD's outstanding claims for payment – from which the court infers that, at that time, Aetna similarly did not challenge Productive MD's right to recover on behalf of patients pursuant to patient assignments. Thus, for at least eight years, including the three-year period covering all disputed claims at issue in this case, Aetna consistently led Productive MD to believe that its patient assignments were valid both generally and under the underlying insurance plans.

In reasonable reliance on Aetna's conduct, Productive MD continued to perform medical services at the request of treating physicians without demanding advance payment from the patients. Aetna's conduct led Productive MD to believe that any disputes with Aetna would concern issues such as whether the tests were, for example, medically necessary and otherwise covered by the insurance plans, but *not* whether Productive MD had procured a valid assignment.

Aetna had full information and every opportunity to raise the assignment issue before this litigation, but never did so. Had Aetna challenged Productive MD's assignments at any stage – either generally or under specific plan term purporting to restrict or prohibit assignment – Productive MD might have acted differently in at least three different ways. First, if Aetna contested the language of the assignments generally, Productive MD could have ceased using that form in favor of a form containing language acceptable to Aetna. Because Aetna never raised the issue, Productive MD continued to perform "free" services on patients pursuant to that assignment language, with the assumption that Aetna would continue to pay medically necessary claims that were otherwise reimbursable under the applicable insurance policies. Second, to the extent particular policies legally restricted assignment, Productive MD could have sought to cure the deficiency by complying with the restrictions either retroactively or prospectively – such as by

ensuring that future patients gave the requisite notice to Aetna, where required. Aetna repeatedly processed claims by Productive MD related to such policies, but never alerted Productive MD that *any* underlying plans imposed assignment restrictions – alleged deficiencies that Productive MD could have sought to cure going forward. Third, if Aetna had challenged Productive MD's claims for payment on the grounds that an underlying policy prohibited assignment, Productive MD would have been on notice not to perform tests without having the patients first confirm that they could assign their rights to Productive MD – at least to the extent such a prohibition was legal.[20]

These circumstances satisfy the five-factor test for equitable estoppel set forth in *Sprague*: (1) Aetna's conduct plausibly amounted to a representation that Productive MD's patient assignments were acceptable both generally and under the specific plan terms; (2) Aetna, in purporting to administer the underlying policies, was presumptively aware of the underlying policy terms; (3) Productive MD reasonably construed Aetna as indicating that Productive MD could continue to receive payment from Aetna for any medically necessary tests covered by the applicable insurance plan; (4) to the extent that any policies restricted or prohibited assignment, Productive MD was not aware – either actually or constructively – of the underlying plan terms; and (5) Productive MD reasonably relied upon Aetna's conduct to its potential detriment in performing tests without demanding payment up front or requiring its patients to inquire about their right to assign before receiving tests.

Finding that estoppel applies against enforcement of an anti-assignment clause is not unprecedented. In *Hermann Hosp. v. MEBA Med. & Benefits Plan*, 959 F.2d 569, 574 (5th Cir.

---

[20]Tennessee law requires that patients have the right to assign health insurance benefits to health care providers and that health insurance policies "clearly" state this right in each policy. As discussed herein, although the court will not address the question in this opinion, it may be that this requirement voids even the assignment prohibitions and restrictions in the ERISA-governed policies at issue here.

1992) ("*Hermann II*"), the beneficiary of an ERISA-governed plan received cancer treatment from the Hermann Hospital for approximately six months until her death. *Id.* at 571. She executed an assignment of her rights to payment to Hermann. *Id.* During those six months, Hermann attempted to receive payment from the claims administrator, which kept postponing payment, asserting that it was "investigating" the claim. *Id.* at 574. Three years after the underlying beneficiary's death, Hermann sued the administrator. *Id.* In the litigation, the administrator for the first time argued that an anti-assignment clause in the underlying plan deprived Hermann of standing to sue. *Id.* As Aetna does here, the administrator argued that the "assignment" was merely an authorization to pay benefits to Hermann, not a conveyance of the right to sue. *Id.*

Under the circumstances presented, the Fifth Circuit held that the administrator was estopped from asserting the anti-assignment clause. *Id.* The court observed that "the anti-assignment clause was contained in the documentation establishing the Plan" but noted that "Hermann, which was not privy to the Plan, had no opportunity to review that documentation." *Id.* The court stated that "[i]t was MEBA's responsibility to notify Hermann of that clause if it intended to avoid any attempted assignments." *Id.* Furthermore, "[i]t had to be clear to MEBA that Hermann, in admitting and providing services to Mrs. Nicholas, was relying on that assignment as its entitlement to recover payment for those Plan benefits that Hermann furnished to Mrs. Nicholas." *Id.* Accordingly, "it was unreasonable for Hermann to lie behind the log for three years without once asserting the anti-assignment clause, of which Hermann had no knowledge, while duplicitously dragging out the ongoing negotiations to liquidate the claim." *Id.* District courts within the Sixth Circuit have cited *Hermann II* favorably on the issue of estoppel. *See Univ. of Tenn. William F. Bowld Hosp. v. Wal-Mart Stores, Inc.*, 951 F. Supp. 724, 731 (W.D. Tenn. 1996) (denying summary judgment and permitting plaintiff to pursue theory that defendant

32

was equitably estopped from asserting anti-assignment clause); *Spectrum Health v. Valley Truck Parts*, No. 1:07-CV-1091, 2008 WL 2246048, at *4 n.4 (W.D. Mich. May 30, 2008) (stating that, "[e]ven if the court were to conclude that Spectrum did not obtain a valid assignment from Clark, the Court would nonetheless conclude that Defendants are estopped from raising the issue of Spectrum's right or authorization to pursue a claim for payment of benefits," where claim administrator "dealt with Spectrum for well over a year and a half without asserting that Spectrum lacked authority"); *see also Leggette v. B.V. Hedrick Gravel & Sand Co.*, Civil No. 3:04CV530-H, 2006 WL 6809606, at *7 (W.D.N.C. May 24, 2006) (citing *Hermann II* for proposition that, "where an ERISA plan initially ratifies an assignment by making medical benefits payments directly to the assignee, and only objects to the assignment when a coverage dispute results in litigation, even a clear anti-assignment provision is unenforceable," and the provider has standing as assignee).

Here, Aetna similarly strung Productive MD along by paying some claims (most claims through 2005, fewer through 2008, and very few thereafter), denying some claims, settling others, and permitting Productive MD to pursue the claims through the administrative remedial process for at least several years. This case presents even more compelling circumstances than those at issue in *Hermann II* and the other district courts cases applying the estoppel doctrine, because Productive MD's reliance interest was premised on hundreds of claims spread across several years, and because Aetna paid one set of medical providers (the physicians) under assignments relative to the same underlying policies that Aetna now claims restricted or prohibited assignment in the first place. Aetna had every opportunity to challenge Productive MD's assignments, was under a legal obligation to disclose any basis for denying the claims submitted, and, relative to the underlying policy terms, possessed complete information. Nevertheless, it "lay behind the log"

until this litigation.

In sum, the court finds that Productive MD has adequately alleged circumstances under which Aetna is equitably estopped from contesting assignment with respect to the 160 ERISA-governed claims at issue in this case.[21]

2.    Waiver as to ERISA-Governed Claims

The parties argue as to whether and how the doctrine of waiver could apply here. Although the parties at times elide the concepts of waiver and estoppel, the concepts are related but distinct.    A waiver is the voluntary surrender or relinquishment of some known right, benefit, or advantage, whereas estoppel is the inhibition to assert it.    *See* 28 Am. Jur. 2d Estoppel & Waiver §35 (database updated Aug. 2013).

Aetna argues that the doctrine of waiver should only apply where plan terms are ambiguous.    However, in support of this position, Aetna cites only to Sixth Circuit authority holding that, under the doctrine of *estoppel*, a court cannot vary the unambiguous terms of ERISA plan documents, at least where the party seeking estoppel was privy to the plan terms.    *See Smiljanich v. GMC*, 302 F. App'x 443, 448 (6th Cir. 2008); *Sprague*, 133 F.3d at 404; *Laird*, 442 F. App'x 194, 201 (6th Cir. 2011); *see also Tendercare (Mich.) Inc. v. Dana Corp.*, No. 02-722623, 2002 WL 31545992, at *4 (E.D. Mich. Oct. 18, 2002).    For its part, Productive MD contends that "[f]ederal common law on waiver applies state contract law" and argues that

---

[21]It is difficult to see how this result prejudices Aetna.    Aetna must allow covered medical services under the applicable plans, whether the claimant is a plan participant or a medical provider acting pursuant to an assignment from the participant (or a beneficiary).    Aetna has acknowledged through its conduct that Productive MD was entitled to recover the insurance benefits for medical services rendered (to the extent they are otherwise covered by the underlying plans) and has interfaced with Productive MD at every step in the claims administration process relative to claims for payment related to those tests.

Tennessee law demonstrates waiver by Aetna. (*See* Docket No. 141 at p. 20.) However, its only authority for the position that state contract law applies to this issue is an unpublished District of New Jersey decision that applied New Jersey law in a similar context, without explaining why it did so. *See Gregory Surgical Servs., LLC v. Horizon Blue Cross Blue Shield of New Jersey, Inc.*, 2007 WL 4570323, at *3-*4 (D.N.J. Dec. 26, 2007).

At any rate, multiple federal district court decisions have found that anti-assignment provisions or other contractual provisions are waivable, even where the contract terms are clear. *See Coonce v. Aetna*, 777 F. Supp. 759, 772 (W.D. Mo. 1991) (where provider failed to obtain "required consent" under patient's plan, Aetna waived right to contest validity of assignment by paying provider and permitting provider to participate in administrative appeals process; court appears to have relied on federal law regarding estoppel in reaching holding); *Glen Ridge Surgicenter, LLC v. Horizon Blue Cross Blue Shield of New Jersey, Inc.*, No. 08-6160 (JAG), 2009 WL 3233427, at *5 (D.N.J. Sept. 30, 2009) (citing New Jersey law and finding waiver, where insurer had "regular interaction . . . prior to and after claim forms were submitted, without mention of [the insurer's] invocation of the anti-assignment clause," which actions "impede [the insurer's] ability to rely on the anti-assignment provision to challenge [the provider's] standing"); *Gregory*, 2007 WL 4570323, at *3-*4 (same). Indeed, given that a "waiver" involves the voluntary relinquishment of a *known* right, the fact that the underlying contractual right to be waived may be clear does not diminish the doctrine's applicability – to the contrary, it may enhance it.

As with the equitable estoppel theory, the court finds that Productive MD has alleged a plausible waiver theory on which discovery is warranted. At a later stage in these proceedings, the court will revisit the issue with a developed record and focused briefing, which ideally will provide clear authority as to whether the court is obligated to apply state law (presumably

Tennessee law) or federal common law to the waiver issue.[22]

4.      Estoppel and Waiver as to the Medicare-Governed Claim

The parties have not cited any authority governing the doctrines of estoppel or waiver with respect to the Medicare-governed claim.   However, as explained herein, the court finds that it lacks jurisdiction over the Medicare-governed claim for payment because Productive MD has not exhausted it.   Therefore, the court expresses no opinion as to whether Aetna has waived or is otherwise estopped from contesting assignment of the Medicare-governed claim.

5.      Estoppel and Waiver as to the Tennessee-Governed Claims

In Tennessee, "waiver is a voluntary relinquishment by a party of a known right."   *Reed v. Wash. Cnty. Bd. of Educ.*, 756 S.W.2d 250, 255 (Tenn. 1988) (quoting *Chattem, Inc. v. Provident Life & Accident Ins. Co.*, 676 S.W.2d 953, 955 (Tenn. 1984)).   The party must know that it has the right before it can waive it.   *See Reed*, 756 S.W.2d at 255 ("If an individual does not know of his rights or if he fails to understand them he cannot waive those rights.")   A waiver may take the form of (1) express declarations, (2) acts and declarations manifesting an intent and purpose not to claim the supposed advantage, or (3) failing to act when action would reasonably have been expected.   *See Gaston v. Tenn. Farmers Mut. Ins. Co.*, 120 S.W.3d 815, 819 (Tenn. 2003); *Jenkins Subway, Inc. v. Jones*, 990 S.W.2d 713, 722 (Tenn. Ct. App. 1998) (citing *Baird v. Fidelity-Phenix Fire Ins. Co.*, 162 S.W.2d 384, 389 (Tenn. 1942)); *Stovall of Chattanooga, Inc. v. Cunningham*, 890 S.W.2d 442, 444 (Tenn. Ct. App. 1994).   "[T[he long-standing rule in Tennessee [is] that *any* contractual provision of a policy of insurance, whether part of an insuring, exclusionary, or forfeiture clause, may be waived by the acts, representations, or knowledge of the

_____

[22]Of course, as discussed in the previous section, if Productive MD's allegations are true, Aetna will be estopped from challenging Productive MD's assignments, in which case the court may not even need to reach the waiver issue.

insurer's agent." *Gaston*, 120 S.W.3d at 819 (emphasis in original).

Waiver may be either express or implied. *Reed*, 756 S.W.2d at 255. "An express waiver is an oral or written statement giving up known rights or privileges." *Grimsley v. Kittrell*, No. M2005-02452-COA-R3-CV, 2006 WL 2846298, at *3 (Tenn. Ct. App. Sept. 29, 2006). An implied waiver, which in Tennessee appears to be synonymous with the doctrine of equitable estoppel in the context presented here, requires the following elements: "(1) [l]ack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such character as to change his position prejudicially." *Reed*, 756 S.W.2d at 255. "[I]t is well-settled that an implied waiver will not be presumed. Rather, the party asserting waiver bears the burden of proving that the party against whom waiver is asserted has, by a course of acts and conduct, or by so neglecting and failing to act, . . . induce[d] a belief that it was the party's intention and purpose to waive." *BMG Music v. Chumley*, No. M2007-01075-COA-R9-CV, 2008 WL 2165985, at *5 (Tenn. Ct. App. May 16, 2008) (citing *Ky. Nat'l Ins. Co., v. Gardner*, 6 S.W.3d 493, 499 (Tenn. App. 1999)). "In order to establish waiver by conduct, the proof must show some absolute action or inaction inconsistent with the claim or right waived." *Id.*.

As with ERISA, the Tennessee Prompt Pay Act, Tenn. Code Ann. § 56-7-120, obligates health insurers to provide timely notice to claimants in writing of the reasons for denying an insurance claim in whole or in part. *Id.* § 56-7-120(ii) (health insurer must "notify the provider in writing why the remaining portion of the claim will not be paid"). Thus, to the extent that Aetna possessed a contractual right to reject Productive MD's assignments, Productive MD reasonably expected that Aetna would raise that issue in the claims administration process. Productive MD was not aware of the underlying policy terms and relied on Aetna to inform it of any restrictions or

prohibitions in the underlying policies. In all 167 instances, Aetna treated the assignments as valid and denied Productive MD's claims for payment on grounds other than the validity of assignment. Aetna never contended that the patients were the real parties in interest or that the patients had failed to follow required plan procedures before effectuating an assignment. Aetna also paid the physician's professional component claims for the same tests. Thus, even if Aetna legally had a right to contest the assignment, Aetna's alleged actions during the relevant time frame (and apparently for at least the last eight years) were inconsistent with any contractual right it may have had to contest assignment under some of the underlying policies. As discussed above, Productive MD reasonably relied on Aetna's conduct to its own detriment in continuing to provide services to patients without demanding advance payment. Thus, for substantially the same reasons discussed above with respect to the doctrine of equitable estoppel as to the ERISA-governed claims, Productive MD has alleged facts showing that, under Tennessee law, Aetna impliedly waived any contractual limitations or prohibitions on assignment.

6.     Potential Additional Grounds for Waiver

In addition to the grounds discussed herein, there are additional grounds for upholding the assignments at issue here and/or for precluding Aetna from challenging them. In light of its holdings concerning the waiver and/or estoppel theories, the court need not decide any of these issues. Nevertheless, they are worth outlining for future consideration in this case.

First, Tennessee statutory law imposes conditions on assignment that may invalidate at least some of the assignment restrictions or prohibitions at issue here. Under Tenn. Code Ann. 56-7-120:

> [W]henever any policy of insurance issued in this state provides for coverage of health care covered under title 63, the insured or other persons entitled to benefits under the policy *shall be entitled to assign these benefits* to the healthcare provider

and *such rights must be stated clearly in the policy*.  Notice of the assignment must
be in writing to the insurer in order to be effective; provided, however, such notice
can be provided by other means if it is so stated in the policy.

Tenn. Code Ann. § 56-7-120(a)(1) (emphases added).  Under the plain language of this statute, a

health care insurance policy must permit assignment of benefits to healthcare providers and must

clearly state in the policy that the patient has a right to assign.  In order to be effective, "notice of

the assignment" must be in writing, unless the policy provides for some other means of providing

notice of assignment.

Aetna references a February 2, 2009 opinion from the Tennessee Attorney General

concerning this statute, in which the Attorney General interpreted a now-superseded version of §

56-7-120(a)(1).  *See* Tenn. Op. Atty. Gen. No. 09-10, 2009 WL 286849, at *1 (Feb. 2, 2009).  In

its pre-June 2010 form, § 56-7-120(a)(1) read as follows:  "[W]henever any policy of insurance

issued in this state provides for coverage of health care rendered by a provider covered under title

63, the insured or other persons entitled to benefits under the policy shall be entitled to assign these

benefits to the health care provider.  Notice of the assignment, unless otherwise provided by

contract, must be in writing to the insurer to be effective."  *Id.*; *see also* 2009 Tenn. Law. Pub. Ch.

918 (S.B. 884, approved May 8, 1992) (enacting relevant language).  Interpreting the pre-June

2010 version of the statute, the Attorney General construed the last sentence as ambiguous as to

whether the clause "unless otherwise provided by contract" modified the phrase "notice of

assignment" or just the term "assignment."  2009 WL 286849, at *2.  The Attorney General

interpreted the "unless" clause as modifying only the word "assignment," meaning that, in the

Attorney General's view, an insurer could prohibit assignment in the underlying insurance policy.

*Id.*  In June 2010, the Tennessee Legislature amended the wording of § 56-7-120(a) in a manner

that effectively abrogated the Attorney General's construction of the statute.  *See* 2010 Tenn. Law

Pub. Ch. 1027 (S.B. 3843, approved June 9, 2010).[23]  In its current form, the language makes clear that, although the insurer can provide for alternate means for notice of assignment (*i.e.*, by some form other than in writing), the patient's right to assign is guaranteed and cannot be abrogated by the policy.

In its initial brief, which in part addressed plan-specific information, Aetna argued that two of the Tennessee-governed plans at issue restricted assignment ("Coverage may be assigned only with the written consent of Aetna" – Patient Nos. 5 and 83) and that a third prohibited it completely ("All rights of the Member to receive benefits hereunder are personal to the Member and may not be assigned." – Patient No. 97).   Of the claims related to those policies, it appears that testing on Patient Nos. 5 (assignment required Aetna's written consent) and 97 (assignment prohibited) occurred before June 2010, whereas testing on Patient No. 83 (assignment required Aetna's written consent) occurred after June 2010.   With respect to the post-June 2010 assignment, the underlying insurance policy appears to restrict assignment in violation of the (applicable) current version of § 56-7-120(a)(1), which merely requires *notice* to the insurer of the assignment, not the insurer's consent thereto.   As to the pre-June 2010 assignments, the underlying policies may violate the statute, depending on whether a court adopts the Attorney General's construction of the pre-2010 version of § 56-7-120(a)(1).   If not, then at least one of the two policies facially violated the statute by prohibiting assignment, and the other may have done so by requiring more than just notice to Aetna.[24]

---

[23]Without changing the assignment language in § 56-7-120(a)(1) at issue here, the statute was later amended to its current form in March 2011.   *See* 2011 Tenn. Laws Pub. Ch. 6 (2011) (H.B. No. 303, approved Mar. 10, 2011).   At any rate, there appears to be no interpretative case law or other legal authority concerning the post-June 2010 version of § 56-7-120(a)(1).

[24]For its part, addressing the issue as a matter of first impression, this court might not have

Productive MD has also suggested, without citation to any relevant legal authority outside the Tennessee statute itself, that the Tennessee assignment statute also controls assignment rights under the ERISA-governed plans at issue here.[25]  (*See* Docket No. 141, Pltf. Resp. re ERISA Claims, at pp. 28-29.)   The issue is not that straightforward: applying the Tennessee assignment statute to ERISA-governed plans involves complex statute-specific preemption concerns, which have divided the circuit courts (relative to assignment laws in other states) and which may present an issue of first impression with respect to the Tennessee assignment statute at issue here. *Compare La. Health Serv. & Indem. v. Rapides Healthcare Sys.*, 461 F.3d 529 (5th Cir. 2006) (finding that ERISA did not preempt Louisiana statute requirement that health insurers honor patient assignments to hospitals) *with Ar. Blue Cross & Blue Shield v. St. Mary's Hosp., Inc.*, 947 F.2d 1341 (8th Cir. 1991) (finding that ERISA preempted Arkansas statute providing that "all . . . contracts, in writing, for the payment of money or property . . . shall be assignable").   Because Productive MD and Aetna have not adequately addressed whether ERISA preempts Tenn. Code Ann. § 56-7-120, the court expresses no opinion at this stage as to whether the Tennessee statute applies to the ERISA-governed plans at issue here.   Furthermore, if the Tennessee statute were

---

reached the same conclusion as the Attorney General with respect to the earlier version of the statute.   The first sentence of the pre-June 2010 version of § 56-7-120(a)(1) stated, without qualification, that insureds "*shall be* entitled" to assign benefits to a health care provider.   The Attorney General's construction of the statute in its February 2, 2009 opinion construed the second sentence of the statute, relating to "notice of assignment," as effectively permitting an insurer to nullify the first sentence.   At any rate, it will be for a Tennessee court on remand to determine the applicability of pre- and post-June 2010 versions of the statute to the Tennessee-governed claims.

[25]Productive MD's citation to *Davidowitz v. Delta Plan of Ca.*, 946 F.2d 1476 (9th Cir. 1991) does not support its position here.   In *Davidowitz*, the Ninth Circuit approvingly referenced several garnishment cases, in which courts had found that ERISA did not preempt the application of neutral garnishment statutes to garnish ERISA welfare benefits.   *Id.* at 1479.   The court in *Davidowitz* found that the reasoning in these cases could not be "stretched" to require that ERISA welfare benefit plans must freely permit assignment.   *Id.*

not preempted, the court would need to determine whether it applies differently to pre-June 2010 and post-June 2010 claims for payment, an issue that has not been addressed by the parties.[26]

Productive MD also alleges that some of the underlying policies are actually ambiguous and/or internally inconsistent with respect to the issue of assignment, or that the policies simply contain "spendthrift" clauses that do not restrict assignment of benefits to healthcare providers in the first place. If true, these allegations might establish additional grounds for enforcing the assignments and/or precluding Aetna from challenging them. However, because the court has deferred conducting a plan-by-plan analysis in light of its findings herein with respect to estoppel and waiver, the court has not reviewed the individual plans and expresses no opinion on these challenges by Productive MD.

### C.    Standing Under the TRPN

Productive MD contends that it maintains essentially two types of claims against Aetna. In one set of claims, Productive MD is attempting to "stand in the shoes" of an insurance plan participant or beneficiary pursuant to an assignment from each patient. In the other set of legal claims, which allegedly relate to approximately 100 of the claims for payment at issue in this case, Productive MD seeks to sue Aetna for breaching the TRPN agreement – essentially, it alleges that Aetna breached a contractual agreement with (or for the benefit of) Productive MD, *independent* of the patient's underlying plan and Productive MD's purported right to recover thereunder.

Productive MD alleges that the TRPN arrangement created a contract between Productive

---

[26]As Aetna has pointed out, it does not appear that the patients provided the requisite notice to Aetna required by the current version of § 120(a)(1). Of course, if any underlying policy (to the extent the current version of § 120(a)(1) applies to a particular policy) failed to "clearly" state that the patient had a right to assign (or, in express violation of Tennessee law, stated that the insured had no right to assign), it would seem to be unfair to fault the patient for not providing notice of assignment to Aetna.

MD and Aetna.   Without the benefit of knowing the terms of Aetna's TRPN agreement, the court

cannot conclude at this stage that Productive MD and Aetna actually had or have a direct

contractual relationship through the TRPN, although Productive MD's TRPN Agreement does

refer to the payors' obligation to pay the provider's "contractual rate."[27]   Regardless, if

Productive MD's allegations are true and Aetna did have an agreement with TRPN to pay 80% of

Productive MD's (along with other providers') medically necessary services, Productive MD

could be, at a minimum, a third-party beneficiary of that arrangement and, therefore, have standing

to sue for its breach – at least to some extent.   *See Owner-Operator Ind. Drivers Ass'n v. Concord

EFS, Inc.*, 59 S.W.3d 63, 68 (Tenn. 2001) ("In order to maintain an action as an intended

beneficiary, a third-party must show: (1) a valid contract made upon sufficient consideration

between the principal parties and (2) the clear intent to have the contract operate for the benefit of

a third party.")   Whether Productive MD has independent standing to sue for the *right* to payment,

as opposed to the rate of payment, may be a complicated question that implicates ERISA

preemption concerns.   As explained in the preemption section herein, discovery concerning the

TRPN arrangement is necessary before the court can determine what claims, if any, Productive

MD can maintain under the TRPN and, if so, whether those claims should be severed.

## III.   Exhaustion of Administrative Remedies

### A.   ERISA-Governed Claims

"Although ERISA does not explicitly require exhaustion of administrative remedies, the

---

[27]Aetna suggests that Productive MD's failure to attach a copy of Aetna's TRPN
agreement undermines Productive MD's position.   However, Productive MD does not have
access to that document absent discovery, and the Magistrate Judge found that Aetna would not be
required to produce it unless and until Productive MD added viable allegations concerning the
TRPN to the First Amended Complaint – which the court finds that Productive MD has done in the
SAC.

administrative scheme of ERISA requires a participant to exhaust his or her administrative remedies prior to commencing suit in federal court." *Constantino v. TRW, Inc.*, 13 F.3d 969, 974 (6th Cir. 1994). Nevertheless, application of the administrative exhaustion requirement is committed to the sound discretion of the district court. *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 418 (6th Cir. 1998). "Although ERISA's administrative exhaustion requirement for claims brought under § 502 is applied as a matter of judicial discretion, a *court is obliged to exercise its discretion to excuse nonexhaustion* where resorting to the plan's administrative procedure would simply be futile or the remedy inadequate." *Id.* at 419 (emphasis added). "The standard for adjudging the futility of resorting to the administrative remedies provided by a plan is whether a clear and positive indication of futility can be made." *Id.* A plaintiff must show that "it is certain that his claim will be denied on appeal, not merely that he doubts that an appeal will result in a different decision." *Id.* The mere "allegation that an appeal would have been futile, without more, is inadequate to excuse a failure to exhaust administrative remedies." *Brigolin v. Blue Cross Blue Shield of Mich.*, No. 11-1525, 2013 WL 781639, at *8 (6th Cir. Mar. 4, 2013) (citing *Fallick*, 162 F.3d at 419); *see also Lindell v. Cigna Grp. Ins.*, Civil Action No. 3:11-CV-00467-H, 2012 WL 3309709, at *4 (W.D. Ky. Aug. 13, 2012) (where procedures for short-term disability claim and long-term disability claim by individual plan participant were independent, participant was not excused from failing to file long-term disability claim because short-term disability claim was denied).

In *Fallick*, the Sixth Circuit explained that the futility exception serves an important ERISA policy purpose. "The law does not require parties to engage in meaningless acts or to needlessly squander resources as a prerequisite to commencing litigation." *Id.* at 420. In *Fallick*, the court found the following factors to be persuasive on the issue of futility: the lawsuit at issue

was not frivolous; the claimant had made unsuccessful inquiries to the insurer to change its methodology for two years, but the parties had essentially reached a "stalemate"; further use of the administrative procedures would have caused the parties additional litigation costs; the factual record was well-established; and, notwithstanding "token concessions" in which the claims administrator had corrected individual accounting errors, the court believed it was certain that the insurer would not "seriously reconsider" the disputed methodology at issue. *Id.* at 420-21. Under the circumstances, even successful efforts to convince the administrator to make minor accounting adjustments through the administrative process would be "but a pyrrhic victory for [the plaintiff] and the proposed class." *Id.* at 421. Therefore, the court found that further exhaustion of administrative remedies would have been futile.

Here, Productive MD has pleaded sufficient facts to establish futility under the *Fallick* standard. It alleges that Aetna purported to have adopted and implemented a policy (CPB 0825) pursuant to which Aetna generally denied claims for testing performed by Productive MD as medically unnecessary. Productive MD also alleges that Aetna "flagged" claims for payment by Productive MD for special treatment in Aetna's "Specialized Investigation Unit." Productive MD also alleges that Aetna communicated these "flags" to the individual claims reviewers, describing each particular test as an "outlier", as "overutilization" of the test, or language to similar effect. According to Productive MD, the written comments by the claims reviewers often specifically stated that the reviewer drew those same conclusions – *i.e.*, that, after receiving a notification that Productive MD was "flagged" for overutilization, a reviewer would deny the claim on the basis that it was not medically necessary. Productive MD also alleges that Aetna came up with a variety of excuses for denying Productive MD's technical component claims, which ranged from meritless to hypocritical. For example, at times, Aetna denied the technical

component claim by Productive MD for failing to include the physician's records, while simultaneously paying the physician who (a) had ordered that test and (b) had never submitted (and was never required to submit) his or her records in the first place.

In Aetna's Reply, Aetna introduces unauthenticated evidence that it contends shows that, with respect to a handful of the 167 patients, Aetna actually paid some amount to Productive MD, ranging from $25.00 to $181.50.   Even assuming that this evidence is properly considered as incorporated by reference into the pleadings, the court finds that it does not preclude a finding of futility under *Fallick*.   Aetna has provided no context for the eight listed CPT codes, which, based on the charts attached to the SAC, appear to reflect only a subset of the CPT codes under which Productive MD sought payment for the referenced tests.[28]   At most, this evidence would establish that Aetna paid only a small fraction of a handful of the 167 tests with respect to which Productive MD seeks reimbursement, while denying the remainder.   As the Sixth Circuit indicated in *Fallick*, a *de minimis* departure from otherwise systematic denials of payment does not preclude a finding of exhaustion.   Indeed, it would gut the futility exception set forth in *Fallick* if a claims administrator could evade review by, every so often, paying a few cents on the dollar for substantially identical claims for payment.

Aetna also argues that the SAC allegations preclude futility to the extent they assert that Aetna provided a variety of different grounds for denying Productive MD's claims.   But Productive MD's fundamental allegation is that Aetna made these various excuses as a pretext for its true motivation: discrimination against an out-of-network provider.   Moreover, if Productive MD's allegations are true, Aetna essentially causes the individual claims reviewers to deny

---

[28]Based on the dates listed, it appears that these codes apply to a total of five patients.

Productive MD's claims by communicating information to those reviewers indicating that Productive MD's tests were not medically necessary. Thus, even if an individual reviewer believes he or she is making an "individualized" determination – and is otherwise none the wiser of Aetna's alleged true motivation – Productive MD may have started with two (or even three) strikes against it in the administrative review process due to policies implemented by other decision-makers.

Under the circumstances alleged, the court finds that this case presents circumstances under which the court is "obliged" to excuse Productive MD from exhausting its administrative remedies with respect to the remaining pending claims. For the past three years, Productive MD has been attempting to receive payment from Aetna for its services, without success. There appears to be no reasonable prospect that Aetna will change its general policy of "flagging" Productive MD for non-payment, Aetna has allegedly denied Productive MD's technical component claims pursuant to a standing internal policy, and Aetna has consistently denied all 41 claims that have been administratively exhausted. With respect to the remaining pending claims for payment, Aetna allegedly has either dragged its feet (sometimes in violation of the applicable plan documents and/or ERISA) or has continued to deny the claims at lower levels in the appeals process. It would serve little practical purpose to force Productive MD to complete the process with respect to those appeals. Therefore, the court finds that Productive MD has sufficiently alleged futility to justify this court's exercise of jurisdiction over the otherwise non-exhausted claims for payment that are governed by ERISA.[29]

---

[29]These same considerations would, upon motion by Productive MD, justify staying the administrative appeals process with respect to the pending, unexhausted claims for payment governed by ERISA.

**B.     Medicare-Governed Claim**

Under the regulations governing the Medicare claim at issue here, a claimant who contests

an adverse benefits determination typically must exhaust four levels of administrative review.

*See* 42 C.F.R. §§ 422.566, 422.600, 422.608, and 422.612.[30]   Unlike its arguments with respect to

the ERISA-governed and Tennessee-governed claims for payment, Productive MD has not

identified any authority under which it may be excused from complying with Medicare's

exhaustion requirement.[31]   Therefore, the court will dismiss the Medicare-governed claim for

payment for failure to exhaust administrative remedies.

**C.     Tennessee-Governed Claims**

Tennessee has adopted the *Fallick* standard of futility with respect to exhaustion of

administrative remedies.   *See Bailey v. Blount Cnty. Bd. of Educ.*, 303 S.W.3d 216, 236 (Tenn.

2010) (adopting *Fallick* "clear and positive indication of futility" standard).   Consistent with

---

[30] Under 42 U.S.C. § 405(h), made applicable to the Medicare Act by 42 U.S.C. § 1395ii, judicial review of claims arising under the Medicare Act must follow the procedures outlined in 42 U.S.C. § 405(g), which requires that a "final decision" be rendered only after all the levels of administrative review have been exhausted.

[31] Through its own research, the court has identified Sixth Circuit authority indicating that, under appropriate circumstances, a Medicare claimant may be excused from exhausting administrative remedies where doing so would be futile.   *Manakee Prof'l Med. Transfer Serv., Inc. v. Shalala*, 71 F.3d 574, 581 (6th Cir. 1995) (citing *Health Equity Res., Urbana, Inc. v. Sullivan*, 927 F.2d 963, 965 (7th Cir. 1991)).   However, the exhaustion requirement for Medicare claims appears to be more stringent than the exhaustion requirement for ERISA-governed claims, requiring a court to consider (1) whether the claims at issue are collateral to the underlying decision as to eligibility for entitlements; (2) whether the claimants would be irreparably harmed were the exhaustion requirement enforced against them; and (3) whether exhaustion of administrative remedies would be futile.   *Manakee*, 71 F.3d at 580 (citing *Bowen v. City of New York*, 476 U.S. 467, 482-486, 106 S. Ct. 2022, 90 L. Ed. 2d 462 (1986).   Given that Productive MD has not argued that it can meet these exacting requirements, the court will not apply the *Manakee* exception here.   Indeed, given the particularity of the Medicare claims review and appeals process, it may be that Productive MD will be able to obtain adequate relief in the administrative forum relative to the Medicare-governed claim for payment.

*Fallick*, the Tennessee Supreme Court has stated that the application of the exhaustion doctrine is within the discretion of the trial court. *Id.* at 237. Having found that the SAC allegations satisfy the *Fallick* standard with respect to ERISA-governed claims, the court finds that, under the doctrine of futility, Productive MD is similarly excused from exhausting administrative remedies with respect to the Tennessee-governed claims for payment. Therefore, the court finds that it has jurisdiction over the Tennessee-governed claims for payment.

## IV. State Law Claims

### A. Overview

Productive MD has asserted several state law claims. The parties do not dispute that (subject to Aetna's objections concerning assignment and exhaustion of administrative remedies) Productive MD may pursue its state law claims relative to the six Tennessee-governed claims for payment.

Aetna argues that, relative to the remaining ERISA-governed claims for payment, ERISA preempts all of Productive MD's state law claims. Productive MD opposes Aetna's position only in part. Productive MD concedes, as it must, that ERISA preempts its state law claims to the extent that those claims seek to recover benefits under the applicable insurance policies. Therefore, relative to the ERISA-governed claims for payment, the court will dismiss the claims for breach of contract under the insurance policies, unjust enrichment, and recovery *in quantum meruit*. However, Productive MD argues that the following claims may proceed relative to the ERISA-governed claims (as well as the Tennessee-governed claims): (1) tortious interference with contractual and business relations; (2) claims for breach of contract related to the TRPN agreement; and (3) statutory claims under Tenn. Code Ann. §§ 56-7-109 and 56-7-105.

### B. ERISA Preemption

ERISA was enacted to replace a patchwork scheme of state regulation of employee benefit plans with a uniform set of federal regulations. *Tolton v. Am. Biodyne*, *Inc.*, 48 F.3d 937, 941 (6th Cir. 1995). To further ERISA's purposes, ERISA includes expansive preemption provisions that are intended to insure that employee benefit plan regulation is exclusively a federal concern. *Aetna Health, Inc. v. Davila*, 542 U.S., 207-208, 124 S. Ct. 2488, 159 L. Ed. 2d 312 (2004); *Cromwell*, 944 F.2d at 1276. State law claims may be preempted in either of two ways: (1) they are "completely preempted" if they duplicate, supplement, or supplant the civil enforcement remedies set forth in ERISA § 502; or (2) they are "expressly preempted" if they conflict with ERISA § 514, which states that any state law claims that "relate to" an employee benefit plan are expressly preempted. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54, 107 S. Ct. 1549, 95 L. Ed. 2d 39 (1987) ("The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal [in § 502] would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA."); *Caffey v. UNUM Life Ins. Co.*, 302 F.3d 576, 582 (6th Cir. 2002) (quoting *Pilot Life*, 481 U.S. at 52) (stating that preempting state causes of action "give[s] effect to Congress's intent that 'the civil enforcement provisions of ERISA § 502 be the exclusive vehicle for actions by ERISA-plan participants and beneficiaries asserting improper processing of a claim for benefits"); 29 U.S.C. § 1144(a) (ERISA § 514(a)); *Metro Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 732, 105 S. Ct. 2380, 85 L. Ed. 2d 728 (1985) (noting "expansive sweep" of § 514(a) preemption clause).

With respect to preemption under § 514, "[t]he phrase 'relate to' is given broad meaning[,] such that a state law cause of action is preempted if 'it has connection with or reference to that plan.'" *Cromwell*, 944 F.2d at 1276 (quoting *Metro. Life Ins.*, 471 U.S. at 730). Such claims are

preempted if they "relate to" an ERISA plan, whether or not they were so designed or intended. *Cromwell*, 944 F.2d at 1276. It is not the label placed on a state law claim that determines whether it is preempted, but whether in essence such a claim is for the recovery of an ERISA plan benefit. *Id.* ERISA's preemption provisions must be given effect, even if they would leave a claimant without a remedy. *See id.* (citing *Caterpillar Inc. v. Williams*, 482 U.S. 386, 107 S. Ct. 2425, 96 L. Ed. 2d 318 (1987)).

In light of ERISA's preemption provisions, state law claims for payment to beneficiaries or their assignees under ERISA-governed employee benefit plans are generally preempted, subject to certain narrow exceptions. "[O]nly those state laws and state law claims whose effect on employee benefit plans is merely tenuous, remote or peripheral are not preempted." *Cromwell*, 944 F.2d at 1276. The Sixth Circuit "has repeatedly recognized that virtually all state law claims relating to an employee benefit plan are preempted by ERISA." *Id.*

Notwithstanding § 514(a)'s broad presumptive reach, § 514(b) also contains a provision that states, in relevant part, that "any law of any State which regulates insurance" is not preempted under § 514(a). Because this clause saves certain state laws from § 514(a)'s preemptive sweep, it is commonly referred as to the "saving clause." *See Int'l Res. v. New York Life Ins. Co.*, 950 F.2d 294 (6th Cir. 1991). The saving clause applies when the state law: (1) has the effect of transferring or spreading policyholders' risk; (2) constitutes an integral part of the policy relationship between the insurer and the insured; and (3) is limited to entities within the insurance industry. *Id.* at 299.

## C.     TRPN Claims Relative to ERISA-Governed Claims

Productive MD argues that Aetna had a legal duty under the TRPN agreement to pay Productive MD 80% of its customary charges for "medically necessary" services. Aetna argues

that Productive MD's claims under the TRPN necessarily "relate to" the underlying insurance plans because Productive MD's right to payment depends on interpreting the terms of those plans. In support of this argument, Aetna does not rely on the signed version of Productive MD's TRPN agreement attached to the Second Amended Complaint. Instead, Aetna relies on an authenticated, unsigned, "blank" document that purports to be a form "Network Rental Agreement" by the TRPN. The document appears to be intended for use in 2004, a date preceding the relevant time period in this lawsuit. Although Aetna argues that this document was incorporated by reference into the SAC, the court finds no basis to conclude that this agreement is the one referenced in Productive MD's operative pleading, particularly where the pleading attaches a signed 2008 version of the TRPN agreement.

With respect to Productive MD's signed version of the TRPN, Aetna's point nevertheless remains a valid one: whether the underlying services are "medically necessary" may turn on whether the service provided is covered by the underlying plan. It would be surprising to the court if Aetna had essentially bound itself to pay 80% of any "medically necessary" services performed by TRPN providers without tying the providers' *right* to payment to the underlying insurance plans. If the right to payment for services – as distinct from the *rate* of payment for those services – did in fact turn on whether the underlying policies covered the service in the first place, then ERISA might preempt the TRPN agreement to that extent, because it could require the court to interpret the terms of the individual plan. Although some courts have found that providers can assert independent claims under separate "provider agreements" with insurers, it is not clear to the court that the TRPN arrangement would even constitute such an agreement in the first place. *See, e.g.*, *Blue Cross of Cal. v. Anesthesia Care Assoc. Med. Grp., Inc.*, 187 F.3d 1045 (9th Cir. 1999) (healthcare providers' claims for breach of provider agreements not completely

preempted).

Regardless, to the extent a patient's ERISA-governed plan covered Productive MD's services, the TRPN might at least dictate the *rate* that Aetna was obligated to pay Productive MD for those services. That is, even assuming that Aetna is correct about the TRPN arrangement, it is not clear to the court whether ERISA would displace the TRPN agreement in whole or, perhaps, only in part. *See Conn. State Dental Ass'n*, 591 F.3d at 1347-1350 (endorsing distinction between "rate of payment" and "right of payment" for ERISA purposes); *Pascack Valley Hosp., Inc. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 402 (3d Cir. 2004) (where hospital and insurer had both contracted with third-party independent consultant to join consultant's network, hospital retained a right to recover because "[c]overage and eligibility" were not in dispute and hospital's cause of action "depends entirely on the operation of third-party contracts executed by the Plan that are independent of the Plan itself"); *Lone Star OB/GYN Ass. v. Aetna Health Inc.*, 579 F.3d 525 (5th Cir. 2009) (claims preempted to extent they reflected denials of coverage but not preempted to extent that dispute concerned rate for covered services).

Furthermore, Productive MD may take the position that Aetna already acknowledged coverage and medical necessity by paying the physicians for the professional component, meaning that the court need not examine the underlying policy. At a minimum, with respect to the handful of Productive MD's claims for payment that Aetna did pay in part (*i.e.*, paying Productive MD under some CPT codes and not others), the issue may present complicated preemption issues. In those instances, Aetna presumably made some type of determination that those particular tests were, at least in part, medically necessary relative to Productive MD. (*See*, *e.g.*, Patient 162.) To the extent that the test or some portion of it was deemed medically necessary, Aetna may have been obligated to pay 80% of Productive MD's customary charges for the covered services under

its TRPN agreement.

The court lacks sufficient information to determine whether and to what extent the TRPN breach of contract claims are preempted relative to the ERISA-governed claims for payment. Under the circumstances, the court finds that discovery concerning the TRPN breach of contract claim is warranted.   At a later stage in this case, with the benefit of a complete record and focused briefing, the court will be able to evaluate whether Productive MD can maintain claims under the TRPN and, if so, whether those claims should be severed.[32]

### D.    Tennessee Statutory Claims

#### 1.    Bad Faith Insurance Denial

Tenn. Code Ann. § 56-7-105 imposes a 25% penalty on insurers who fail to pay a reimbursable loss within 60 days of a demand by the insured party, and requires the insurer to pay the claimant's reasonable attorney's fees incurred in contesting the insurer's bad faith denial.   *See Bishop v. Provident Life & Cas. Ins. Co.*, 749 F. Supp. 176, 177-178 (E.D. Tenn. 1990).   Here,

---

[32]As explained herein, the court will sever and stay the other state law causes of action. However, because the court cannot resolve whether and to what extent ERISA preempts the TRPN claims without further information, the court will not sever or stay the TRPN claims (to the extent they relate to ERISA-governed policies), at least temporarily, to resolve the preemption issue. Thus, once the relevant record is established, Aetna will be without prejudice to move for dismissal of those TRPN claims as preempted and/or to sever those claims, as appropriate.   There appear to be approximately 108 TRPN claims relating to testing on patients subject to ERISA-governed policies.

As the court construes the SAC, Productive MD also alleges that, of the seven non-ERISA claims for payment at issue, four of the Tennessee claims for payment (Patient Nos. 5, 83, 97, and 165) and the Medicare-governed claim for payment (Patient No. 81) included "TRPN" notations. (*Compare* Docket No. 117, Aetna Mem. (listing non-ERISA policies) *with* SAC Attachment I (listing EOBs with "TRPN Notation").)   Because the court will permit the Tennessee-governed claims for payment to proceed but will sever and stay those claims for the reasons explained herein, the court will similarly sever and stay the TRPN breach of contract claims associated with the Tennessee-governed claims for payment.   Because the court is dismissing the Medicare-governed claim for payment for failure to exhaust administrative remedies, the court will also dismiss the associated TRPN breach of contract claim without prejudice.

Productive MD argued in its Response that this statutory claim falls under ERISA's saving clause but provided no authority for this position.

Contrary to Productive MD's unsupported position, at least one district court in this circuit has held that ERISA's saving clause does not save Tenn. Code § 56-7-105 from preemption under ERISA, because the state statute does not affect the spreading of policyholder risk and does not constitute an integral part of the insured-insurer relationship. *Id.* at 178 (collecting cases from other jurisdictions reaching similar conclusion). The Sixth Circuit has also found that ERISA preempted an Ohio bad faith insurance denial statute. *See Schachner v. BlueCross & BlueShield of Ohio*, 77 F.3d 889, 896-97 (6th Cir. 1991); *see also In re Life Ins. Co. of N. Am.*, 857 F.2d 1190, 1194-95 (8th Cir. 1988) (holding that ERISA preempted claims under Missouri Vexatious Refusal to Pay Statute). In the absence of any cited authority to the contrary, the court finds *Bishop* and *Schachner* to be persuasive. Accordingly, relative to the ERISA-governed claims for payment, the court will dismiss the Tennessee bad faith insurance denial cause of action as preempted by ERISA.

### 2. Prompt Pay Act Claim

Under the Tennessee Prompt Pay Act, Tenn. Code Ann. § 56-7-109, health care insurers must comply with certain timeliness and notification requirements for claims for payment submitted by health care providers. For example, for electronically submitted claims for payment, the insurer has 21 days to (i) pay the claim if it is "clean" (meaning it requires no further information, adjustment, or alteration to be processed and paid), (ii) pay the clean portion and notify the provider why the remaining portion of the claim has not been paid, or (iii) notify the provider of the reason why the claim is not clean and inform the provider what documentation is necessary to adjudicate the claim. *Id.* § 56-7-109(b)(1)(B). Failure to comply with the Act results

in a 1% interest penalty on any improperly denied balance.  *Id.* § 109(b)(4).

Whether ERISA preempts a Tennessee Prompt Pay Act claim (under some or all circumstances) appears to be a question of first impression within the Sixth Circuit.   With respect to "prompt pay" statutes in other states, federal courts have reached varying conclusions.   In *Schoedinger v. United Healthcare of Midwest, Inc.*, 557 F.3d 872, 875-76 (8th Cir. 2009), the Eighth Circuit found that a Missouri Prompt Pay Statute, Mo. Rev. Stat. § 376.383, was preempted under § 514(a), where the plaintiff physician sued pursuant to a patient assignment.   The court rejected the plaintiffs' argument that the relationship between the statute and the applicable ERISA plan was "too remote."   *Id.* at 876.   However, presumably because the parties did not raise the issue, the court did not address whether the saving clause in § 514(b) applied to save the statute from preemption under § 514(a).   Other courts have found that particular prompt pay act claims are not preempted by ERISA under certain circumstances, typically where a provider sues pursuant to a separate contractual agreement with the insurer, *not* pursuant to a patient assignment. *See, e.g.*, *Mem'l Hosp. Sys. v. Aetna Health, Inc.*, Civil Action No. H-06-00828, 2007 WL 1701901, at *5 (S.D. Tex. June 11, 2007) (claims under Texas Prompt Pay Act not preempted with respect to rate of payment); *Torrent & Ramos, M.D., P.A. v. Neighborhood Health P'ship, Inc.*, No. 05-21668-CIV, 2005 WL 6358852, at *4-*5 (S.D. Fla. Sept. 27, 2005).

Here, in the SAC, Productive MD appears to assert the Tennessee Prompt Pay Act claim only in its capacity as an assignee.   To that extent, and consistent with the findings of the circuit court and district court decisions in other jurisdictions concerning this issue, the court finds that the Prompt Pay Act claims are preempted by ERISA relative to the ERISA-governed claims for payment.   The saving clause does not apply to save the Tennessee Prompt Pay Act claims from preemption, because, although the statute is limited to health care insurers, the Tennessee Prompt

56

Pay Act does not have the effect of transferring or spreading policyholders' risk and does not constitute an integral part of the policy relationship between the insurer and the insured.

### E.    Tortious Interference

Tennessee recognizes a common law claim for intentional interference with business relationships, *Trau-Med of Am. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002), as well as a statutory claim for unlawful inducement of breach of contract, Tenn. Code Ann. § 47-50-109. Productive MD alleges that Aetna has attempted to interfere with Productive MD's relationships with its physicians by (1) sending letters to Aetna's in-network physicians intended to dissuade those physicians from utilizing Productive MD; and (2) consistently denying Productive MD's claims for payment in an effort to force Productive MD into a network contract with Aetna.

A threshold question is whether Productive MD's interference claim "relates to" the underlying ERISA-governed plans.   Regardless of the terms of any particular benefit plan (whether or not that plan is subject to ERISA), Aetna has an independent legal duty not to intentionally interfere with Productive MD's business relationships with physicians, to the extent that those business relationships exist independently of any particular insurance plan.   Thus, to the extent that Productive MD alleges that Aetna is intentionally interfering with Productive MD's existing business relationships or future business relationships with physicians by sending negative communications about Productive MD to those physicians and/or by intimidating those physicians, the tortious interference claim is not preempted.   *See Gardner v. Heartland Indus. Partners, LP*, 715 F.3d 609, 614 (6th Cir. 2013) (where defendant had an independent duty under Michigan law not to interfere with plan participants' retirement plan subject to ERISA, ERISA did not preempt Michigan interference claim).   The claim does not turn on interpreting the terms of any particular insurance policy, ERISA-governed or otherwise.   Instead, it merely involves

determining whether Aetna has intentionally sought to dissuade doctors from utilizing Productive MD's services generally.

Although many district courts within this circuit have dismissed tortious interference claims as preempted by ERISA, those cases typically involve a situation in which an entity seeks to utilize the interference claim to duplicate relief available under ERISA. For example, when a participant or assignee argues that, with respect to a particular claim for payment, the claims administrator (or some affiliate thereof) "interfered" with payment under the plan by unfairly denying the claim, courts have found that the interference claim is preempted. *See, e.g.*, *Adkins v. Unum Provident Corp.*, 191 F. Supp. 2d 956, 959 (M.D. Tenn. 2002); *Steele v. United Parcel Serv., Inc.*, 499 F. Supp. 2d 1035, 1041 (E.D. Tenn. 2007); *Ctr. for Special Procedures v. Conn. Gen. Life Ins. Co.*, Civil Action No. 09-6566 (MLC), 2010 WL 5068164, at *7 (D.N.J. Dec. 6, 2010) (holding that insurer could not tortiously interfere with its own insurance plan). Here, the interference claim does not relate to any particular payment denial. Instead, Productive MD alleges that Aetna has directly contacted physicians and told them to stop utilizing Productive MD because it is an out-of-network provider.

On the other hand, to the extent that Productive MD is alleging that Aetna's failure to pay the technical component claims is part of Aetna's attempt to interfere with Productive MD's business, that theory turns on whether Aetna is obligated to pay Productive MD's claim under the applicable insurance policies. To the extent that Aetna has unfairly denied the claims relative to ERISA-governed insurance policies, Productive MD can obtain relief under ERISA. Therefore, the court finds that ERISA preempts the interference claim under that specific theory of liability.[33]

_____

[33]In light of Productive MD's allegation that the physicians *are* being paid for the professional component of the tests at issue, it is not clear to the court why Aetna's denials of

As to the merits of the interference claim, Aetna argues that Productive MD has failed to plead the requisite elements of a contractual interference claim, including damages. Although Aetna is correct that Productive MD has not alleged that any particular physician contract or relationship was breached, Productive MD has alleged that Aetna intentionally attempted to dissuade physicians generally from utilizing Productive MD's services. At least for Rule 12 purposes, the potential damage to Productive MD's business is self-evident: if physicians cease using Productive MD's services, then Productive MD loses potential revenue. At any rate, the SAC contains a plausible claim for relief that places Aetna on notice of the nature of Productive MD's tortious interference with business relations claim.

## V. <u>Motion to Sever</u>

Under Fed. R. Civ. P. 21, "[a]ny claim against a party may be severed and proceeded with separately." District courts have broad discretion to determine whether to sever claims when doing so advances the administration of justice. *Peterson v. Dean*, No. 3:09-cv-628, 2010 WL 5184794, at *14 (M.D. Tenn. Dec. 14, 2010); *Wright, Miller & Kane*, Fed. Prac. & Proc. § 1689 (3d ed. 2011). In determining whether to sever claims, courts may consider the following factors: (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for separate claims. *Six L's Packing Co, Inc. v. Beale*, No. 3:10-cv-01132, 2012 WL 928897, at *2 (M.D. Tenn. Mar. 19, 2012).

---

Productive MD's technical component claims would impact Productive MD's business relationships with those physicians in the first place.

Here, the scope of discovery relative to the ERISA claims has been and will remain more limited than that applicable to the non-ERISA claims. In ERISA cases, a district court may permit discovery into matters relating to a procedural challenge to an administrator's decision, including bias. *See Wilkins v. Baptist Healthcare Sys.*, 150 F.3d 609, 615 (6th Cir. 1998). However, "any prehearing discovery at the district court level should be limited to such procedural challenges." *Id.* "District courts are well-equipped to evaluate and determine whether and to what extent limited discovery is appropriate in furtherance of a colorable procedural challenge under *Wilkins*." *Johnson v. Conn. Gen. Life Ins. Co.*, 324 F. App'x 459, 466 (6th Cir. 2009); *see also Heffernan v. UNUM Life Ins. Co. of Am.*, 101 F. App'x 99, 109 (6th Cir. 2004) (upholding award of attorney's fees under 29 U.S.C. § 1132(g)(1) for time spent by counsel on discovery, because court properly authorized discovery to explore a procedural challenge). "If discovery into the alleged procedural defects supports a plaintiff's allegations of due process denial, then a district court is obligated to permit discovery into more substantive areas of a plaintiff's claim." *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 430-31 (6th Cir. 2006) (finding that it was appropriate for court to permit discovery on the issue of whether a denial of due process occurred). In sum, discovery related to the ERISA-governed claims is limited, whereas discovery related to non-ERISA claims is not.

Here, there are essentially three sets of state law claims: (1) claims under the TRPN agreement relative to approximately 108 ERISA-governed claims for payment; (2) Tennessee state law claims related to the six Tennessee-governed (non-ERISA) claims for payment, including any associated TRPN claims; and (3) the Tennessee interference claim. As to the first of these claims, it is unclear to the court without further discovery whether and to what extent these TRPN claims may be preempted. Therefore, the court finds that it will not sever these TRPN

60

claims for that limited purpose.   As to the latter two categories, the court finds that severance is warranted.   Although the claims emanate from a common allegation – that Aetna is discriminating against Productive MD as an out-of-network provider – the claims are subject to different substantive law than the ERISA-governed claims, different discovery standards, and a different standard of review.   Furthermore, the state law claims must be tried to a jury, whereas the ERISA-governed claims are not subject to a jury trial.

The court is particularly concerned that discovery concerning the state law claims would overwhelm and confuse the limited scope of additional discovery that the court will permit relative to the ERISA-governed claims.   If this court continues to administer discovery concerning the state law claims, those claims might continue to sidetrack the parties and the court from adjudicating issues related to the 160 ERISA-governed claims.   Accordingly, in the interest of fairness and judicial economy, the state law claims, other than the TRPN breach of contract claims relating to ERISA-governed claims for payment, will be severed and stayed.[34]

## VI.   The Scope of the Remaining Claims

Subject to the severance and stay of certain state law claims, the following two categories of claims will proceed: (1) the 160 claims for payment related to ERISA-governed policies; and (2) claims related to the TRPN agreement.   In the interest of providing guidance to the parties and the Magistrate Judge going forward, the court will outline what it currently perceives to be the relevant

---

[34]Aetna removed the original Complaint, which did not identify the underlying insurance policies, on the basis of both federal question and diversity jurisdiction.   (Docket No. 1 ¶¶ 3-4.) In the SAC, Productive MD now alleges that the court has original jurisdiction over the ERISA-governed claims for payment, and both diversity and/or or supplemental jurisdiction over the non-ERISA claims for payment and other state law claims.   In support of its Memorandum concerning the Motion to Sever, Aetna stated in passing that the court should remand the state law claims to Tennessee state court.   (Docket No. 86 (stating that "non-ERISA claims should be severed and remanded to State court."))   Aetna has provided no legal authority for the position that this court may remand state law claims that are based on diversity jurisdiction.

areas of further inquiry.

With respect to the TRPN claims, the court must retain jurisdiction to determine whether the TRPN claims are preempted in whole or in part.   The court anticipates that the parties will engage in discovery concerning the nature of their relationship(s) with each other and/or with TRPN, Inc., including their contractual agreements related to the TRPN arrangement and their respective understandings of those relationships.   The court anticipates discovery as to whether Aetna's inclusion of a "TRPN" notation on certain EOBs reflected its acknowledgment to certain TRPN terms.   The court expects that discovery concerning the TRPN arrangement will, relative to the ERISA-related discovery, be narrowly tailored and will not interfere with discovery concerning the ERISA-governed claims.

As to the ERISA-governed claims for payment, the court will permit further discovery concerning (1) Aetna's alleged systematic bias in administering Productive MD's claims and (2) facts relating to Productive MD's estoppel and waiver theories.   Under the circumstances of this case, the court rejects Aetna's position that discovery and the court's ultimate adjudication of the case will be limited only to Aetna's handling of the "technical component" claims by Productive MD, without reference to Aetna's handling of the "professional component" claims by the physicians.   The alleged dichotomy in Aetna's handling of the professional component claims in all respects goes to the core of Productive MD's fundamental allegations of systematic bias, internally inconsistent (and allegedly inexplicable) claims administration, and hypocrisy by Aetna.

The court expects that additional discovery could at least include the following issues: whether and why Aetna has utilized processes (including automated processes) and/or policies to "flag" Productive MD for non-payment; when and how those processes and/or policies went into effect; what effect that flagging had on the administration of Productive MD's claims for payment;

62

whether and on what grounds Aetna paid the professional component claims for tests performed by Productive MD; whether and why Aetna may have delayed processing Productive MD's claims for payment relative to the corresponding physician claims for payment, or otherwise imposed procedural hurdles on Productive MD that it did not impose on the physicians who ordered the tests; whether Aetna accepted (or, conversely, challenged) patient assignments relative to the physicians who ordered the same tests; whether the physicians were in network or out of network relative to Aetna at the relevant time; whether any relevant decision-makers or executives at Aetna sought to discriminate against Productive MD as an out-of-network provider in the claims administration process or made oral or written statements to that effect; and how Aetna purports to justify paying the physicians for the professional component (in large part) while simultaneously denying (in large part) Productive MD's technical component claims. As stated herein, the court will consider whether the individual claims reviewers acted as otherwise innocent "cat's paws" in a process allegedly rigged by Aetna from the outset. To be clear: in light of Productive MD's allegations, which go well beyond "mere speculation," the court will ultimately consider evidence outside the administrative record in determining whether Aetna was actually biased in administering Productive MD's technical component claims.

## VII.    Dispute Concerning Scope of Administrative Record

On January 18, 2013, Productive MD filed a Motion to Specify Content of Administrative Record, with respect to which the parties filed numerous submissions. (*See* Docket Nos. 112 (Aetna Resp.), 114 (Productive MD Reply), 118 (Aetna Sur-Reply), 123 (Productive MD Response to Sur-Reply), and 125 (Aetna's proposed Response to Productive MD's Response to

Sur-Reply)).[35]   Broadly, Aetna's position is that the administrative record is limited only to

information specifically considered by the individual claims reviewers with respect to the

technical component claims for payment submitted by Productive MD, whereas Productive MD

contends that the court should define the "administrative record" as including, *inter alia*, Aetna's

handling of the professional component claim, all documents related to flagging that resulted in

review by the SIU, documents concerning any automated processes that specially affected

Productive MD's claims, any outside studies conducted by Aetna related to Productive MD's

services, and any communications by Aetna related to Productive MD's services.   The parties

vigorously dispute how Aetna internally maintained these forms of information during the relevant

time frame.

Typically, the administrative record is limited to "the record before the administrator at the

time of the decision."   *Cate v. CNA Ins. Cos.*, 965 F. Supp. 1039, 1044 (M.D. Tenn. 1997)

(quoting *Perry v. Simplicity Eng'g*, 900 F.2d 863, 966 (6th Cir. 1990)).   However, the court may

consider evidence "outside of the administrative record 'if that evidence is offered in support of a

procedural challenge to the administrator's decision, such as an alleged lack of due process

afforded by the administrator or alleged bias on its part.'"   *Huffaker v. Metro. Life Ins. Co.*, 271 F.

App'x 493, 503-504 (6th Cir. 2008) (quoting *Wilkins*, 150 F.3d at 619).

Here, the court has found that, regardless of the actual scope of the administrative record, it

will consider evidence outside the administrative record in evaluating Productive MD's

---

[35]In a February 4, 2013 Order, the Magistrate Judge granted Productive MD's pending motion related to the administrative record only to the extent that it requested additional time to review Aetna's proposed administrative record.   (*See* Docket No. 105, 2/4/13 Order ¶ 4.) Although that Order did not address the merits of the motion, it appears that the motion was incorrectly termed on the docket, even though it remained an operative motion that the parties continued to brief.

allegations of bias and procedural irregularities.   Furthermore, even Aetna concedes that it

utilized particularized claims administration procedures for Productive MD's technical component

claims.   These procedures apparently included some type of internal policy directives and/or

automated processes that, across all of Productive MD's claims for payment, singled out

Productive MD's for special scrutiny and/or non-payment.   Additional discovery concerning

these specialized (and presumably atypical) procedures specific to Productive MD will provide the

court with more context to evaluate what types of information constituted the "administrative

record" as such, as compared to relevant information outside the administrative record that the

court will consider in any case.   Under the circumstances, the court finds that defining the

administrative record at this stage would be unnecessary and would not materially advance the

court's administration of this case.   Therefore, the court will deny Productive MD's motion

concerning the administrative record without prejudice.

## VIII.   **Third-Party Discovery and Potential Third-Party Practice**

Aetna has indicated that it may seek to take discovery from the physicians and/or to

implead the physicians as parties.   Aetna has intimated that Productive MD and the physicians

may have had some type of inappropriate contractual or business arrangement that resulted in the

overutilization of Productive MD's services.   (*See* Docket No. 137, Aetna Resp. at p. 7 ("[Aetna]

has good reason to believe that Productive MD has a financial relationship with the physicians who

ordered the tests at issue in this case.   Aetna also has good reason to believe that Productive MD

has intentionally influenced certain physicians to order such tests, knowing full well Aetna's

position on the appropriate coverage and medical circumstances for ordering those tests").)

From the court's present perspective, the adjudication of Productive MD's allegations of

bias and procedural irregularities turn on whether Aetna systematically discriminated against

Productive MD as an out-of-network provider. The relevant facts implicate, *inter alia*, what Aetna knew or believed at the time Productive MD's technical component claims were denied (and the corresponding physician professional claims were allowed), and what information *Aetna* – not just individual claims administrators – considered when (a) flagging Productive MD for special treatment, (b) structuring the claims administration process for Productive MD's claims, and/or (c) denying particular technical component claims. It may be that, at the time, Aetna suspected that Productive MD was overutilizing the test or that Productive MD had "oversold" its tests to the physicians. Information known to Aetna *at that time* may be relevant to whether Aetna reasonably denied Productive MD's technical component claims (as opposed to simply discriminating against Productive MD because it was out-of-network) – and Aetna may seek to present that information to the court to refute evidence of bias. However, with respect to the ERISA-governed claims for payment, this litigation will not be a vehicle for Aetna to conduct a fact-finding mission to retroactively validate pre-existing suspicions or to come up with alternative grounds for denying the technical component claims that were actually not known to or considered by Aetna at the time.[36]

It appears that at least some of the discovery that Aetna seeks from the physicians relates to the state law claims that are being severed and/or otherwise may not be relevant to the ERISA-governed claims for payment. In light of the court's findings in this opinion, which have limited the operative claims to the ERISA-governed claims for payment and the associated TRPN

---

[36]It is possible that this type of information will be relevant to one or more of the *state law* claims that the court is staying. For example, to the extent that Productive MD maintains that Aetna interfered with Productive MD's contracts with physicians, the existence of contractual agreements between the physicians and Productive MD would likely be relevant and, therefore, discoverable by Aetna. It may also be that Aetna could assert independent claims against Productive MD premised on the alleged improper arrangements. But that would be a separate case.

breach of contract claims, the court will grant Productive MD's Motion for Protective Order.   In quashing the subpoenas, the court is not foreclosing Aetna from seeking third-party discovery from the physicians, provided that Aetna can justify the relevance of that discovery to the ERISA-governed claims for payment.

## CONCLUSIONS

For the reasons stated herein, the court finds as follows:

- The ERISA-governed claims will proceed and the parties will be permitted to conduct additional discovery related to the specific topics referenced herein.   Relative to the ERISA-governed claims, Productive MD's claims for breach of the underlying insurance contracts, unjust enrichment, recovery in *quantum meruit*, violation of the Tennessee Prompt Pay Act, violation of Tenn. Code Ann. § 56-7-105, and tortious interference with respect to denial of specific claims for benefits pursuant to patient assignments will be dismissed with prejudice as preempted under ERISA.

- The Medicare-governed claim will be dismissed for failure to exhaust administrative remedies.   The associated TRPN breach of contract claim will be dismissed without prejudice.

- With the exception of the TRPN breach of contract claims relative to the ERISA-governed claims for payment, the court will sever and stay Productive MD's remaining state law claims, including (1) all claims related to the six Tennessee-governed claims for payment, including the associated TRPN breach of contract claims, and (2) Productive MD's interference claim on grounds other than Aetna's denials of Productive MD's claims for benefits pursuant to patient assignments.

- The court reserves judgment as to whether the TRPN claims are preempted in whole or in part relative to the ERISA-governed claims for payment. Aetna will be without prejudice to move for dismissal and/or severance of those TRPN claims upon an appropriate evidentiary foundation.

- Productive MD's Motion to Specify Content of the Administrative Record will be denied without prejudice.   Productive MD's Motion to Supplement that motion will be denied as moot.

- Productive MD's Motion for Protective Order (and the corresponding motion to supplement) will be granted.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge